## MAYES v. MAYES et al.

(Court of Civil Appeals of Texas. Galveston. July 1, 1913. Appellant's Motion for Rehearing Denied Oct. 16, 1913.)

1. WILLS (§ 166*)—UNDUE INFLUENCE—CIRCUMSTANTIAL EVIDENCE.

While circumstantial evidence may be sufficient to justify setting aside a will for undue influence, the court, in determining whether the evidence is sufficient to show undue influence, can only find the affirmative of the issue in case all the circumstances considered together produce in the ordinary mind a reasonable belief that undue influence was exerted in the procurement of the will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

2. WILLS (§ 82*)—VALIDITY—UNDUE INFLUENCE—REASONABLENESS.

Where a will is attacked for undue influence, its unreasonableness, in view of testator's family relations, is not sufficient in itself, even in the absence of any explanation, to justify setting it aside.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 203; Dec. Dig. § 82.*]

3. WILLS (§ 166*)—UNDUE INFLUENCE—EVIDENCE.

In proceedings to probate a will, evidence held insufficient to justify a finding that it was the result of undue influence, though the disposition was unnatural, unreasonable, and unjust.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

4. WILLS (§ 155*)—VALIDITY—"UNDUE INFLUENCE."

The term "undue influence," as applied to the execution of a will, means that testator's volition and free agency have been overcome by importunities and arguments of the person charged to induce testator to make the will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*

For other definitions, see Words and Phrases, vol. 8, pp. 7166–7172; vol. 8, pp. 7823, 7824.]

5. WILLS (§ 277*)—CONTEST—UNDUE INFLUENCE—PLEADING.

While a will is contested for alleged undue influence, it is not necessary for the contestant to allege what the arguments were, or in what form the importunities charged against the person alleged to have influenced testator were presented.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 632–635; Dec. Dig. § 277.*]

Appeal from District Court, Chambers County; L. B. Hightower, Judge.

Application by G. C. Mayes for probate of the will of J. J. Mayes, deceased, to which W. F. Mayes and others filed objections. From a judgment refusing probate, proponent appeals. Reversed and remanded.

Stevens & Stevens, of Liberty, B. F. Louis, of Houston, and A. W. Marshall, and Beason & Davenport, all of Anahuac, for appellant. Stuart R. Smith, Walter J. Crawford, and C. E. Mead, all of Beaumont, E. B. Pickett, Jr., of Liberty, and R. J. McMurrey, of Anahuac, for appellees.

PLEASANTS, C. J. This appeal is from a judgment of the district court of Chambers county refusing to admit to probate the will of J. J. Mayes, deceased, which was offered for probate by appellant, G. C. Mayes, the executor named in said will, and its probate contested by the appellees, W. F. Mayes, Rachel Davis, joined by her husband, G. C. Davis, and Woodson Mayes.

The fourth ground upon which the contest of the will was based, and which the trial court found was sustained by the evidence, in so far as it charges that the will was procured by undue influence exerted upon the mind of the deceased by the appellant, is as follows: "Fourth. Because if the said J. J. Mayes did execute or sign, or caused to be signed or executed, the said will, he was unduly influenced to so do by the compulsion and arguments of and to avoid the importunities of other persons, to wit: G. C. Mayes, Arch Middleton and his wife, Effie Middleton, Mrs. Mary Mayes, George V. Mayes, and Frank H. Mayes, acting themselves and through Ray Wallis and J. R. Davis, and yielded to such importunities and compulsion and allowed the minds of such persons, on account of the feebleness of his own, to take the place of his own mind and to guide him in the making of such will without in fact assenting himself thereto; that such importunities, undue influence, and compulsion were of such a character and strength as to overcome the volition and desire of the said J. J. Mayes, and his free agency in making a will was destroyed because of his inability to resist, through weakness and fear, the insistent importunities of such other persons, and on account of his desire for peace and quiet."

The record discloses the following facts: J. J. Mayes died on the 10th day of January, 1912, leaving surviving him his wife, 76 years old and with whom he had lived in wedlock something over 60 years; his sons, G. J. Mayes, Wm. F. Mayes, and Woodson Mayes; and his daughters, Mrs. Rachel Davis, wife of G. C. Davis, and Mrs. Effie Middleton, wife of A. D. Middleton. The only other child having issue was Jackson Mayes, who died some years ago leaving his widow, Mrs. Mary Mayes, and two sons, George Vernon Mayes, 16 years old, and Frank Hardin Mayes, 14 years old, all of whom survive. Including these two grandchildren there survive him ten grandchildren, five boys and five girls. On the 21st day of March, 1910, he made the will offered for probate, by which he bequeathed all his property except $1 each to his children, to his five grandsons, G. C. Mayes and Joshua Mayes, sons of G. J. Mayes, who still lives, George Vernon Mayes and Frank Hardin Mayes, sons of Jackson Mayes, deceased, and Mayes Middleton, son of A. D. and Effie Mayes Middleton. The said grandsons, G. C. and Joshua Mayes, have two young sisters married to young men

without means, but who appear to be making a livelihood by manual labor. The other three grandchildren are daughters of Wm. F. Mayes, who together with his daughters are in moderate circumstances. None of the children of deceased have a great deal of property, except the daughter Mrs. Middleton, who with her husband is wealthy. Testator's son Woodson Mayes lived with him and has been for several years in a bad state of health and is without any means at all. Deceased's daughter Mrs. Davis, and her husband, G. C. Davis, are past middle age and have practically nothing, and she has been compelled for several years to assist in making a living by keeping boarders. G. C. Mayes is named in the will as executor, and it is provided that no bond or security shall be required of him as such executor and no action shall be had in the county court in the administration of the estate of the deceased other than the probate of the will and a return of an inventory and appraisement and list of claims. The will was witnessed by R. W. Wallis and J. R. Davis and Dale La Four.

The deceased had been engaged in stock raising in Chambers county during all of his married life. His children remained with him, all living under the same roof, until they married and had families of their own, when they would settle close by. Upon the birth of each child he would set apart to it some of the female calves, thus giving each child an interest in the herd, which increased as time passed. By the joint efforts of himself and children during the time that they lived with him, he had accumulated about 10,000 acres of land. This land was mostly purchased with the proceeds of the sale of beef cattle. In the sale of such cattle no accounting was made with the children under 21 years of age for any of their cattle so sold, and no demand was made by the children for such accounting, but the mother would sometimes call his attention to the fact that he was selling the children's cattle and using the money to buy land, and his reply was: "It is for their benefit. It will all come back to them." There was no discord in the family and there was strong mutual affection between the father and all of the children, which continued until his death. He was fond of all his grandchildren and never showed any partiality for any one of them over the others, and all of them were dutiful and affectionate in their conduct towards him. The deceased was in poor health for a number of years before his death. His bad health was largely due to a disease of the prostatic gland which was chronic and produced a ureamic condition, which because of its poisonous effect upon the blood tended to weaken his mental condition. He had not been able to ride horseback for a number of years before his death, and dur-

ing the last four or five years of his life he walked with difficulty and was frequently subject to fainting spells, and whenever he went out on his premises he was generally accompanied or watched by some member of his family. He and his wife had several conversations in regard to his making a will. He proposed to her that they make a joint will; he giving her all of his property, and she giving hers to him. She would not agree to make a will of this kind, giving as her reason that the property should go to their children. Some five or six years before his death he got W. B. Gordon, a former county judge of Chambers county, to write two or three wills for him which gave his property to all his children in equal proportions. He never signed any of these wills, but returned them to Gordon with the statement that they did not suit him. In regard to these wills and the desire of the deceased as to the disposition of his property, Gordon testified: "When he would return these wills, he would tell me they did not suit him, and would not give his reasons. I do not think he ever did tell me to write a will and fix it so the children could not spend the property. I think that was the idea of it; he tried to entail the estate so it could not get out of the family. I mean by that, the idea he conveyed to me was this: This property divided up was not worth much, but if they all could come together it was a living for them all. * * * The understanding of that was that he was to have two of his family to be executors in the will, and hold it in accord, just like Jackson's here, all hold together, but that did not seem to suit him at all, and he never executed it. That is the way he wanted it, so they all could not sell it. He did not want it sold, but wanted it kept in the family; that seemed to be his idea. As to whether he wanted the grandchildren to have it, when he told me to fix it up—well, I do not remember his ever mentioning his children to me at all; the way he said he wanted the property kept was, he wanted the property kept together, that it was not susceptible of a fair division at all. He wanted his property kept together then, but the wills I wrote him never did suit him at all. I do not know what became of them; I reckon he tore them up right then, or burned them up."

About four years before the will in controversy was executed the deceased had a serious spell of sickness, and believing that death was probably near, and being surrounded by his family, he called up his family physician to witness a verbal will in which he expressed his desire that all of his property should go to his wife during her life and that it should go to their children after her death.

The mother of appellant, G. C. Mayes, died when he was a child, and he and his broth-

er were raised by their grandparents. Four or five years before the death of the deceased the appellant became his agent in charge of the cattle. Prior to that time W. F. Mayes, a son of the deceased, was the special representative of his father in the handling and management of the cattle, and it seems that appellant's promotion and the retirement of W. F. Mayes as the special representative of the deceased was gradual and came about by the tacit consent of all the parties and not by the express appointment of the deceased. It appears that the deceased was generally consulted in regard to the sale of the cattle, but the active work of looking after and handling the cattle was left to the appellant.

The appellant testified that about a year and a half before the will was executed his grandfather told him that he intended to will his property to his five grandsons and that he frequently talked to him about making the will; that he (appellant) did not bring the subject up, and never discussed it except when deceased began to talk about it; that he did not tell the deceased that he was opposed to his making such a will, but never advised or tried in any way to influence him to make it. Deceased asked appellant to say nothing about his making a will until after his death. He also asked appellant who he should get for witnesses to the will, and appellant suggested R. W. Wallis and Rube La Four, both of whom were friends and associates of appellant. Rube La Four was told by appellant that deceased wanted him to witness his will, but he did not mention the matter to Wallis.

Some time after this conversation between appellant and the deceased in regard to who should be asked to witness the will, Wallis, who lived about 12 miles from deceased, made a visit to the home of deceased and was told by him that he wanted to make a will and wanted him (Wallis) to attend to having it prepared. He told Wallis that he wanted to will his property to his five grandsons and asked him to get J. R. Davis, a lawyer who lived near, to prepare the will. He first told Wallis not to say anything about the will, but afterwards told him he might tell the appellant and his brother Josh. In accordance with the request of the deceased, Wallis saw Davis, and the will was prepared as directed by the deceased. The will was prepared and executed a few days after Wallis had given Davis the instructions of deceased. In this interval Wallis saw appellant and told him that the will was being prepared by Davis and would be executed. After getting Wallis to attend to the preparation of the will for him, deceased requested Mr. Dale La Four, who came to visit him, to witness the will. The record shows that before La Four went to the home of deceased on this occasion he had been told by Wallis that deceased wanted to see him, but it does not appear that Wallis informed him what deceased wanted to see him about. Deceased told La Four what disposition he intended to make of his property and told him when to come back for the purpose of witnessing the will. When deceased asked La Four to witness the will, he requested him to keep the matter secret. On the day appointed La Four came to the home of deceased. In the meantime Wallis had been sent by deceased to tell Davis to bring the will to a thicket in the pasture of the deceased some distance from the house. La Four and deceased left the house for the pretended purpose of taking off a dead chicken, went to the thicket, and there met Wallis and Davis, and the will was executed. The ruse in regard to the dead chicken was suggested by deceased for the purpose of preventing his wife from suspecting his purpose in leaving the house. It is not shown who took possession of the will immediately after its execution, but a short time thereafter deceased gave it to his daughter Mrs. Middleton, and told her to take care of it. He had told her before he made the will what kind of a will he intended to make, and when he gave her the will to keep he told her what it was and told her to keep it secret. She gave the will to her husband to take care of, telling him it was her father's will, but not informing him as to its contents.

No one knew anything about the will until after the death of the deceased except the witnesses to the will, the appellant, and his brother Josh, and Mrs. Middleton and her husband, and he did not know the contents of the will. There is some evidence tending to show that the children of the deceased not in the secret of the will were not invited or permitted by the wife of appellant, who seems to have had charge of the matter, to "sit up" with the deceased during his last sickness as often as they desired.

The evidence justifies the conclusion that deceased had no confidence in J. R. Davis as a lawyer, and had often been heard to make fun of him and say that if he wanted a lawyer he would not hunt Davis. He had however, employed Davis occasionally, and it does not appear that he had any regular attorney or had ever employed any other attorney.

Each of the parties charged by the petition to have influenced the deceased to make the will testified that no such influence was exerted or attempted to be exerted, and that the deceased was not advised or requested to make such a will, nor was the making of such a will suggested to him. There is no evidence that the appellant had any special influence over him or controlled him in any matter. The extent of his connection with and direction of the business affairs of deceased is thus stated by him, and his testimony is uncontradicted: "I reckon I have

had charge of Mr. Mayes' stock for the last two or three years. The work I did was to gather the cattle and handle them when the the river was up, bring them up out on the prairie, and carry them back. He directed the work to be done. I would consult him about selling cattle, and I acted under his directions for the last year before his death, and all the time, and two years before his death. About the time he is said to have made this will, March, 1910, and during that period, I talked to him about my business affairs. But he did as he pleased; I had to do what he said. As to whether he was a man that could be easily controlled, or a man of firm convictions, well, when he set his head, he done as he pleased; he seemed to do a little opposite if he thought a man was meddling with his affairs; he would not stand any meddling; he has always been that way, ever since I can remember. * * * Mr. Mayes trusted me with some of his business. I handled his money; that is, I collected his money when I sold cattle. I never made trades that amounted to much. I sold a few head around to those butchers. I think he did rely on me as being head of his affairs for something like four years, maybe. I commenced before I commenced talking about the will. I began as head of affairs there before the will was talked about. I have been about three or four years in charge of his affairs."

The trial court filed conclusions of fact; the material findings being as follows: "I find that the testator at the time he made the will was 87 years old, afflicted with several serious diseases, extremely decrepit and feeble of mind and body, and in an advanced state of senile decay. I find he had enough mind, left alone to himself, to afford him testamentary capacity, and that the will was read to him at the time he signed it, and that he understood its contents; that he knew his property and the objects of his bounty. I find that the will offered for probate and the disposition of the property thereunder is unreasonable, unnatural, and unjust; that no reasons appear sufficient in their operation on a reasonable mind, acting in its own course and strength, to change an intention to make an ordinary and fair disposition to a purpose to make the unnatural and unreasonable disposition that we find here. The proof shows, and the court finds, that the execution of said will was procured by the undue influence exerted upon the mind of the deceased by the proponent, G. C. Mayes. I find that a confidential relationship existed between the deceased and the proponent, G. C. Mayes, who had charge of his affairs as his agent and adviser. I find that the testator signed the will offered for probate. I find that no specific acts of fraud, misrepresentation, or deceit, as charged in the fifth paragraph of the contestants' amended pleading, were proved."

Under appropriate assignments of error the appellant assails the finding of the trial court that the execution of the will of the deceased, J. J. Mayes, "was procured by the undue influence exerted upon the mind of the deceased by the appellant," on the ground that there is no evidence to support such finding.

[1] It is generally true that the exercise of undue influence in procuring the execution of a will can only be shown by circumstances. Direct evidence of such fact is rarely ever obtainable, and unless circumstantial evidence is resorted to it would be seldom that a will could be set aside on this ground. In determining the question of whether the evidence in a particular case is sufficient to establish undue influence, all of the circumstances shown by the evidence should be considered, and even though none of the circumstances standing alone would be sufficient to show undue influence, if when considered together they produce in the ordinary mind a reasonable belief that undue influence was exerted in the procurement of the will, they are sufficient to sustain such conclusion. We do not think the circumstances shown by the evidence in this case are sufficient to justify the conclusion that the execution of the will was procured by undue influence exerted by appellant. Certainly none of the circumstances shown by the evidence or found by the trial court is sufficient in itself to establish undue influence.

[2] The learned trial judge states in his conclusions of law that the unreasonableness of the will in view of the family relations of the deceased was sufficient in itself, in the absence of any reasonable explanation of why such a will should have been made, to justify setting it aside. This conclusion is manifestly unsound.

[3] The will is an unusual one, and it appears to us, from what the evidence shows as to the relations between the deceased and his children and the conditions under which property was acquired, that it was unnatural and unreasonable for the deceased to give all of his half of the property to his grandsons, and there is no reasonable explanation in the evidence of this disposition of the property; but this would not authorize the court to hold the will invalid. The court finds, and the uncontradicted evidence fully sustains the finding, that the deceased had testamentary capacity and that the will was read to him at the time he signed it and he knew his property and the objects of his bounty. The testimony of the witnesses to the will and all of those who knew of its execution shows that the deceased dictated the terms of the will without suggestion from any one, and that the disposition of his property made by the will was his voluntary

act conceived in his own mind uninfluenced or aided by the advice or suggestion of any one. If this is true, the fact that the will is unreasonable, unnatural, and unjust will not authorize the court to set it aside. The right of the owner of property to dispose of it by will to whomever he may choose is a valuable right which should not be denied because such disposition is not in accord with that which is generally regarded as natural, reasonable, and just. If at the time the will is executed the testator has the capacity to know and understand what he is doing and his volition has not been subverted and overthrown by undue influence exerted over him by others, the disposition made by him of his property should stand, notwithstanding such disposition may appear unnatural, unreasonable, and unjust, and is without reasonable explanation. Salinas v. Garcia, 135 S. W. 591.

There is no evidence that appellant influenced or controlled the mind of the deceased in any matters. Even in the business relations which existed between them appellant's was not the directing or controlling mind, but he acted only as directed by the deceased. The fact that the making of the will was kept secret is shown by all of the testimony to have been in accordance with the request and instructions of the deceased, and, having for some unexplained reason determined to make the disposition of his property evidenced by this will, it was entirely reasonable that he should not have desired to arouse the displeasure of his wife and children by informing them that he had made such a will. The court acquits all of the other persons charged by the contestants with having exerted undue influence in procuring the execution of the will, and also finds that no fraud or deceit was practiced by any of them. We think the evidence is no stronger against the appellant than it is against the other persons named, and does not show undue influence exerted by any of them. It is as unreasonable that appellant should have exerted his influence in favor of the other beneficiaries named in the will as that the deceased should have chosen to make them his beneficiaries to the exclusion of his children.

To sustain this judgment would be to hold that, when a will is unnatural and unreasonable and one of the beneficiaries of the will bore such relation to the deceased as offered him the opportunity to exert his influence in procuring the execution of the will, undue influence may be inferred. None of the decisions have gone to this length in setting aside the will of a person of testamentary capacity who executed his will with a full knowledge and understanding of its contents. We think the evidence in this case only raises a surmise or suspicion that appellant may have unduly influenced the deceased in making his will and is not sufficient to justify the reasonable belief that the will was not the voluntary act of the deceased but was the result of undue influence exerted by the appellant. Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059.

We think the allegations of the petition charging that the execution of the will was procured by undue influence allege facts sufficient to show undue influence and the trial court did not err in overruling appellant's exceptions to the petition.

[4, 5] The term "undue influence," while easily comprehended and understood, is somewhat difficult to define; but if the importunities and arguments used by appellant to induce the deceased to make the will were of such character and strength, in view of the feeble condition of the mind and body of the deceased, as to overcome his volition and free agency, undue influence would be shown, and it was not necessary to allege what the arguments were or in what form the importunities were presented. In the very nature of things this would rarely ever be known by the contestants of the will.

It follows from our conclusion that the evidence is not sufficient to sustain the finding of the trial court that the execution of the will was procured by undue influence exerted by appellant, that the judgment should be reversed, and the cause remanded, and it is so ordered.

Reversed and remanded.