**BARKSDALE et al. v. DOBBINS et al.**
No. 5626.

Court of Civil Appeals of Texas.
Texarkana.

June 5, 1940.

Rehearing Denied June 20, 1940.

Smith & West and Brachfield & Wolfe, all of Henderson, for appellees.

WILLIAMS, Justice.

This suit is a direct attack upon the will of M. M. Barksdale, hereinafter referred to as decedent, instituted in the County Court of Rusk County by appellees, Jesse Lee Blackwell and Mrs. Lorine Dobbins, joined by her husband, W. D. Dobbins, against Claude Barksdale, Mrs. Nettie Neal and Mrs. Minnie Priddy, to set aside the probate of same, and for annullment of the will itself. Being denied the relief sought in the county court, appellees appealed. On trial de novo in the district court, the jury in response to special issues found in answer to No. 1, that the execution of the purported will was procured through the undue influence of Claude Barksdale and Mrs. Minnie Priddy, or one of them; and to No. 2, that decedent lacked testamentary capacity. Judgment was entered setting aside and holding for naught the purported will and the probate thereof.

Decedent's estate consisted of his half-interest in an 88-acre farm near Overton, Texas, together with his mineral interest in same and proceeds of oil runs therefrom, which at his death was in excess of $90,000 in value. Under the terms of the will decedent bequeathed to three children, Claude Barksdale, Nettie Neal and Minnie Priddy, to share alike, his entire estate, save and except $25 each to Lorine Dobbins and Jesse Blackwell, the children of his deceased daughter, Maggie Blackwell. Claude, Nettie and Minnie were named independent executor-executrixes without bond. The will also provided no action should be had in the county court other than to receive and probate the will. The last three named and Maggie Blackwell were the four and only children of the marriage of decedent and his wife. His wife died intestate in 1918. Maggie died August 15, 1931, survived by her daughter, Lorine, and son, Jesse Lee. Decedent died December 3, 1937, at the age of ninety-three. The will in controversy is dated July 20, 1935.

Under the first five propositions, grounded on motions for an instructed verdict and exception to the submission of either issue to the jury, appellants assert that there is no evidence to support either jury finding.

The evidence introduced covers the period from 1931 to 1937, inclusive. In August, 1931, after the discovery of oil, Claude

Frank C. Bolton and McDavid & McDavid, all of Henderson, for appellants.

Barksdale, who lived in San Antonio, came to Overton, Texas. From that time until his father's death he spent most of his time in and around Overton. He, his father and Mrs. Priddy lived together during this period of time. Approximately two months subsequent to Claude's arrival there his father executed a will on October 10, 1931, and eleven days later a codicil to same, both later destroyed upon the execution of the will in controversy.

According to the testimony of Mr. Burton, a telephone official at Tyler, Claude Barksdale told witness that he had left his business in San Antonio and come to Overton to take care of his father's business and look after the affairs of the estate. This witness further testified that Claude stated his father had reached that age and part of life where he was easily influenced; had a mind like a child and was not capable of taking care of his business. Mrs. Priddy was present on one occasion and expressed herself substantially the same. Mr. Almond, a telephone official at Troupe, Mr. Vinson, a furniture merchant at Overton, and Mrs. Motley, a niece of deceased, testified that Claude had made statements substantially to the same effect to each of them at their respective places of business. Mrs. Gregory testified that she stayed in the home when Mrs. Priddy left to visit Mrs. Blackwell in 1931, and Mrs. Priddy told the witness, "I want you to watch Pappy (an affectionate term applied to decedent by his family and acquaintances) and not let him sign any papers as he will sign anything anybody asks him to." The dates of these respective conversations are not definitely shown other than that some occurred in the latter part of 1934 over into 1935, and some from 1931 on up to 1936. Mrs. Priddy and Claude denied making any such statements.

The evidence reflects that during the last few years of decedent's life, after he began to receive his money from the oil wells, he was accompanied by either Claude, Mrs. Priddy or her son whenever he left the home. Mrs. Gregory testified that she heard decedent tell Mrs. Priddy that he was going to buy a little house nearby from a Mr. Pope, and "was going to move in it, that he couldn't step out of the house without he was watched and fussed at, and he was tired of it;" and Claude spoke up and said, "he wasn't going to get the house, that he would stop that." Claude did request Pope not to sell the house to his

father. Testimony of other occurrences were given which reflected surveillance over decedent. During the years 1931 to 1936, Lorine Dobbins, her husband and their three minor children, lived within two blocks of decedent. They often visited each other. Decedent referred to the Dobbins as his babies. Decedent visited this family, in their sickness. Lorine remembered him with flowers on his birthday and candy at Christmas. Decedent frequently visited and chatted with Mr. Dobbins at his barber shop. In short, the natural and friendly family interest existed between decedent and the Dobbins family that is usually found in such a family relationship.

The evidence does not reflect above cordial mutual feeling between Mrs. Priddy and the Dobbinses nor Claude and that family. Mrs. Priddy objected to decedent's visiting in the Dobbins home, or having Mr. Dobbins do his barber work; referred to the oldest Dobbins child as a little heifer; and said that the whole Blackwell family was sorry. Claude did not visit Mr. Dobbins. Maggie died at Marfa, Texas, August 15, 1931. Claude, who had notice of her death, drove from San Antonio to Overton on August 16th, the day of her funeral at Marfa. Mrs. Dobbins refused to give Claude a power of attorney to handle her part of her mother's estate.

The circumstances surrounding the execution of the three above-mentioned instruments were detailed by Mr. J. W. McDavid, a reputable attorney who prepared each at the request of decedent. He testified that when he prepared the 1931 will, decedent came into his office and told witness he wanted to make a will, remarking that the children had their mother's part and could do as they pleased with it, and "I am going to do as I please with mine." In this instrument he bequeathed all his property to Claude, Minnie and Nettie, and named Claude and Nettie independent executors. Eleven days later, he returned to have his will changed, stating that he had been told that unless the grandchildren were mentioned in the will it would not stand up and he wanted it to stand up. He was advised by Mr. McDavid that this was not the law in Texas, but a codicil was prepared and executed which bequeathed to Lorine and Jesse Lee each $25. In July, 1935, he returned to have another will made. This time he stated that he wanted Minnie to be added as an executrix, and further stated, "I have been thinking about

the other will, my hand was hurt and my signature was wabbly. My hand is well and I want to sign it with my usual signature." The former will and codicil were destroyed at the time, and the will in controversy was executed and placed in Mr. McDavid's lock box.

Each of these instruments were prepared in the law office of Mr. McDavid in Henderson, Texas. Mr. McDavid further testified that only he and decedent were together in his private office when each of these instruments were drawn by him and executed. Further questioned as to whether he saw any member of this family in town on the day the will was executed, he testified: "I don't recall, but generally Claude or Miss Minnie, or sometimes both, would come in the car with him, but I don't recall seeing either one that day." Henderson is some fifteen miles from Overton. Decedent could not drive an automobile. The record is silent as to who carried him to Henderson. Another witness testified of seeing decedent in company with Claude and Mrs. Priddy going in or out of this law office twice shortly after June 16, 1935. Two or three days after his death, Claude, Mrs. Priddy and Mrs. Neal, unaccompanied by Mrs. Dobbins, called at the law office, where the will was opened. It was filed for probate December 7, 1937; four days after his death.

The record is silent as to who suggested, if any one, that decedent name either or all the chief beneficiaries as independent executors without bond, or what layman advised decedent that it was necessary to name the two grandchildren in a valid will. The record is further silent that either of the three ever discussed with decedent that he make a will or suggested to him any of its terms. The record does reflect the activity of Claude wherein he sought the aid of his father and cousin to get his aunt, Mrs. Finney, a sister of decedent, to change the terms of her will and make Claude the administrator. In connection with this effort to secure a change in Mrs. Finney's will another attorney visited decedent at the home, which this cousin testified was at the suggestion of Claude. Mr. Crim, one of the witnesses to his will, and others who had been intimately acquainted with him, after stating details of their association, testified that in their judgment decedent was of sound mind, above the average in mind for his age; bore the reputation of being fair and honest; and carried no grudge or malice towards any one. As Mr. Crim expressed it, he regarded decedent as a normal man in possession of his mental faculties and "keen as a brier." Briefly, the medical testimony dealt with the physical changes of a man of advancing years; the gradual weakening of the body, and, as a general rule, the corresponding weakening of the mind and its susceptibility of being influenced by those younger. Other medical testimony and other witnesses were to the effect that decedent was an exception to this general rule.

Mr. McCord, a county commissioner, testified to a conversation later more fully detailed, in which decedent stated that he was going to leave his property to his children and grandchildren. The record reflects that this remark and the statements made to Mr. McDavid, above detailed, are the only expressions that decedent ever made about the disposition of his property to any one.

■ Attention is first directed to the attack that there is no evidence to support the jury finding on undue influence. "It is generally true that the exercise of undue influence in procuring the execution of a will can only be shown by circumstances. Direct evidence of such fact is rarely ever obtainable * * *." In determining this question, "All of the circumstances shown by the evidence should be considered, and even though none of the circumstances standing alone would be sufficient to show undue influence, if when considered together they produce in the ordinary mind a reasonable belief that undue influence was exerted in the procurement of the will, they are sufficient to sustain such conclusion." Mayes v. Mayes, Tex.Civ.App., 159 S.W. 919, 922; Russell v. Boyles, Tex.Civ.App., 29 S.W.2d 891; Holt v. Guerguin, Tex.Civ. App., 156 S.W. 581. And in the consideration of the assignments that assert the court erred in refusing to direct a verdict for appellants upon this issue, the evidence will be considered most favorable to the verdict, disregarding conflicts, contradictions and all adverse evidence. Reinhardt v. Nehring, Tex.Civ.App., 283 S.W. 347; Williams & Chastain v. Laird, Tex. Civ.App., 32 S.W.2d 502, 505. Or, as held in Holt v. Collins, Tex.Civ.App., 131 S.W. 2d 813, all evidence tending to support the jury finding must be accepted as true and interpreted in the light most favorable to the prevailing party. Viewing the evidence under above rules, we have an aged man,

past ninety-one years when he executed the will; the statements of two of the chief beneficiaries that he had a mind like a child and was easily influenced, and these statements being borne out by their close surveillance over him; their association with and opportunity to exert their influence; and the unfriendliness of these two towards the Dobbins family. The record reflects that fondness, affection and love of decedent for Mrs. Dobbins and her children which naturally exists on the part of a grandfather towards grandchildren. The unequal distribution of his property and the unnatural disinheritance of this grandchild is unexplained. The record further discloses that Claude took the lead in the management of his father's estate; sought a power of attorney from Mrs. Dobbins to manage her interest in her mother's estate; and made an effort to get his aunt to change the provisions of her will, enlisting the aid of his father, cousin and a lawyer in an effort to accomplish this purpose. Decedent's first will was executed within two months after Claude's arrival on the scene. Some one had advised decedent that he must name his grandchildren to make a valid will, when he returned and executed the codicil. All these instruments were executed when decedent resided in the Priddy home.

■■■ In Lee v. Rwy. Co., 89 Tex. 583, 588, 36 S.W. 63, quoted with approval in Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059, 1063, it is said: "To authorize the court to take the question from the jury, the evidence must be of such a character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it." Or, as stated in Western Assur. Co. v. Busch, Tex.Civ.App., 203 S.W. 460: "The test as to the conclusiveness of the evidence is, Could it reasonably be supposed that the minds of unprejudiced men of ordinary intelligence might differ about it, either as to the weight to be given to the testimony or to the deduction drawn therefrom?"

A jury supposed to be impartial and of ordinary intelligence has passed upon all these facts and circumstances in evidence and reached the conclusion adverse to appellants' contention. The evidence raises more than a mere surmise or suspicion. We are unprepared to invade the province of the jury and hold that these facts and circumstances admit of only one reasonable conclusion. Appellants' assignment that there is no evidence to support this find-

ing of undue influence is overruled. Russell v. Boyles, supra; Holt v. Guerguin, supra; Mayes v. Mayes, supra; Chandler v. Weimers, Tex.Civ.App., 57 S.W.2d 585; Goodloe v. Goodloe, 47 Tex.Civ.App. 493, 105 S.W. 533; Gallagher v. Neilon, Tex.Civ. App., 121 S.W. 564; Craycroft v. Crawford, Tex.Com.App., 285 S.W. 275; Long v. Long, 133 Tex. 96, 125 S.W.2d 1034, 1036; Johnson v. Poindexter, Tex.Civ.App., 9 S. W.2d 172. From the conclusions reached, we pretermit a discussion of the assignment that there is no evidence to support the jury's finding of lack of testamentary capacity. Craycroft v. Crawford, supra.

■■■ Over the objection that it was hearsay and too remote, the witness McCord was permitted to testify to a conversation he had with decedent in March or April, 1934, namely: "Well, my mother died the second day of January, and I met him that morning and he asked me the question, 'What did your mother do with her property?' and I told him, 'She willed it all to my niece,' and he just made the remark, 'That is not right, I am not going to do that, I am going to leave my property to my children and grandchildren.'" Upon the authority of Holt v. Guerguin, Tex. Civ.App., 156 S.W. 581; Stubbs v. Marshall, 54 Tex.Civ.App. 526, 117 S.W. 1030; Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138, 1143; Brown v. Mitchell, 88 Tex. 350, 31 S.W. 621, 622, 36 L.R.A. 64, the contention here urged is overruled. See, also, McCormick & Ray on Evidence, Sec. 418.

■■■ In the thirteenth proposition complaint is made of the refusal of the court to give appellants' requested instruction No. 2 to the effect that mere "persuasion or entreaty by the beneficiary, or some one else on their behalf, is not the character of undue influence which is contemplated by law when speaking of undue or improper influence." The main charge together with appellants' requested instruction No. 1 given by the court sufficiently covered the issue of undue influence under the evidence. Upon the authority of Robinson v. Stuart, 73 Tex. 267, 11 S.W. 275; and Gallagher v. Neilon, Tex.Civ.App., 121 S.W. 564, the action of the trial court is sustained.

■■■ In his argument to the jury attorney West stated: "Now, gentlemen, they are going to say, Why didn't you bring witness in to say he didn't (meaning M. M. Barksdale) have testamentary capacity? Our reply is, we brought here before you the

testimony of the two people who of all the people in the world under the shining sun were best in a position to know what his condition was. I refer to Claude Barksdale and Mrs. Priddy. We brought you witness after witness who told you what their opinion was—said he was like a child. What did they say? In effect, that Claude, and on one occasion Mrs. Priddy, went to see Mr. Burton and said the man (meaning decedent) had gotten old and childish, that he was not capable of taking care of his business. Claude said that was why he was up there, and he had to watch him all the time."

The qualification to the bill of exception shows this argument had reference to the testimony of the witnesses Almond, Burton, Vinson and others as to the statements which had been made to them by Claude and Mrs. Priddy out of the presence of decedent. Appellants' alleged statements to the witnesses introduced by appellees were admissible in evidence. Appellants' denials that they had made such statements was in evidence. This argument is not susceptible of the construction as urged in the fourteenth proposition that it was a comment upon the failure of appellants to testify with reference to transaction with decedent as prohibited under Article 3716, R.C.S.1925.

Propositions 15, 16, 17 and 18 attack the court's action in not granting a new trial because of alleged improper and prejudicial argument of appellees' counsel which is complained of for the first time in their motion for new trial. This argument is incorporated in the bills of exceptions Nos. 13, 14, 15 and 16, and being lengthy will not be set out. They are presented collectively and will be so discussed here. From the evidence introduced the jurors already knew that Maggie Blackwell was one of the four children of decedent; that she had worked with her parents on the farm when it was being paid out; that she had died and appellees were her only children. They had learned that the estate was valued in excess of $90,000, all of which had been bequeathed to appellants except the $50. The issues were of such nature that any jury of ordinary intelligence would have known that their affirmative answers to the two issues would be favorable to appellees and from the evidence knew the result of such affirmative answers. Finck Cigar Co. v. Campbell, Tex.Com.App., 133 S.W.2d 759, and authorities there cited. And further, in

the language of Justice Sharp in Ramirez v. Acker, Tex.Sup., 138 S.W.2d 1054, 1056, "We think the argument * * * was of such a nature that, if it had been objected to, a reprimand by the court to counsel for making such argument and an instruction * * * to disregard such argument would have rendered it harmless." The argument is not subject to the construction that counsel argued to the jury that they should place themselves in that of plaintiffs and decide the special issues like they would want to be treated. This was nothing more than an appeal to the jury, as reasonable men, to consider (upon the issues of undue influence and testamentary capacity) whether they would have acted, under similar facts and circumstances, as decedent did. In short, if the provisions of this will were the natural act of a reasonable man.

Propositions Nos. 7, 8, 9, 10, 11, 12 and 19 have each been considered, and are overruled.

The judgment is affirmed.