Mary Lee RODDY et al., Appellants,

v.

William A. GRAHAM, Sr., et al., Appellees.

No. 3948.

Court of Civil Appeals of Texas.

Eastland.

May 7, 1965.

Rehearing Denied May 28, 1965.

Key, Carr & Clark, William C. Clark, Lubbock, for appellants.

Scarborough, Black, Tarpley & Scarborough, Beverly Tarpley, Abilene, for appellees.

GRISSOM, Chief Justice.

In January, 1962, Mrs. Annie Graham had a quarrel with two of her daughters, Mary Lee Roddy and Rose Grace Doak, over a business transaction and law suit between Mrs. Roddy and her brother Bill. Mrs. Graham told them then that she was going to give everything she had to Bill. On April 11, 1962, Mrs. Graham executed a will in which she divided her estate into sixths. She gave one sixth to a son of a deceased son and one sixth to each of three of the five surviving children. Mary Lee Roddy and Rose Grace Doak were given only $1.00 each. Mrs. Graham left the remaining two sixths of her estate in trust for the benefit of the children of Thomas A. Graham, the youngest child, who was about nine years younger than the child next to him. Mrs. Graham died on December 11, 1963. She had then been married to W. A. Graham for more than fifty seven years. Her husband, a sister and her youngest daughter, Annie Lou Donica, were appointed independent executors and trustees. They offered the will for probate. It was contested by Mrs. Roddy and Mrs. Doak on the grounds of lack of testamentary capacity and the exercise of undue influence by her husband and her daughter, Annie Lou Donica. Upon a trial de novo in the District Court, a jury found that Mrs. Graham executed the will as the result of the undue influence of W. A. Graham and Annie Lou Donica. The court rendered judgment, notwithstanding such findings of undue influence, probating the will. Contestants have appealed.

In various ways, contestants contend the court erred in holding there was no evidence to support the findings that execution of said will by Mrs. Annie Graham was caused by the exercise of undue influence by either

W. A. Graham or Annie Lou Donica. They point out evidence that the attorney who wrote the will had never met Mrs. Graham prior to the time she executed it; that all directions for its preparation were given to the attorney by Mr. Graham; that when Mrs. Graham came with her husband to the attorney's office to execute the will it had already been written; that she was in a weakened physical condition; that before Mrs. Graham signed the will she merely requested the lawyer to read it to her; that he read the will to her and her only remark was "that's fine", whereupon she signed it in the presence of the lawyer and his secretary as witnesses; that Mrs. Roddy frequently visited her mother over the years; that after Mrs. Graham became sick Mrs. Donica visited more often; that Mrs. Graham had weak spells and blackout spells as early as 1961; that in the spring of 1962, she had a high fever and for a few days could not speak plainly; that after the quarrel between Mrs. Graham and contestants and after Mrs. Graham had excluded them as beneficiaries of her will she and her husband made a gift of minerals to all the children and grandchildren, including Mrs. Roddy and Mrs. Doak; that Annie Lou Donica first learned in January, 1962, that Mrs. Graham intended making a will disinheriting Mrs. Roddy and Mrs. Doak; that Mrs. Graham and Annie Lou discussed that matter several times and Mrs. Donica did not discourage her mother from disinheriting her two sisters and that, although oil had been discovered on the Graham land, Mrs. Graham was a little reluctant to give the minerals to the children and grandchildren because she feared that if they had a long sickess their money might be insufficient and that she had difficulty understanding the nature of oil interests and realizing how "well off" she was.

Appellees present counter points to the effect that the court correctly held there was no evidence to support the findings that the will was the product of the undue influence of either testatrix' husband or daughter. They say appellants fail to point out evidence which, viewed in the light most favorable to them, supports such findings and that it does not exist. They point out that exclusion of appellants as beneficiaries under the will did not benefit either Mr. Graham or Mrs. Donica and that the only persons benefited thereby were the seven minor children of Thomas Graham. The record shows that, although well educated, Thomas is not a financial success; that he had his wife and seven minor children reside in a house supplied by his parents and immediately adjoining them; that they have been largely supported by the parents; that, apparently, if said children, who appear to be much loved by the grandparents and all members of the family, are to be educated that their education must be paid for by some one else and that this was a reason that two sixths of testatrix' estate was placed in trust for their benefit. It is undisputed that shortly before execution of the will there was a violent argument between Mrs. Graham and contestants; that Mrs. Roddy had sued her brother, Bill, and had obtained a judgment against him for land and money; that Mrs. Doak attended the trial and "sided with" Mrs. Roddy in the matter; that Mrs. Graham took up for Bill, resented their action and accused Mrs. Roddy of being interested in nothing but money. Mrs. Doak testified there was a violent quarrel "on her mother's part"; that her mother became highly excited; that it was the most terrible experience of her life; that when Mrs. Doak arrived her mother was saying a lot of terrible untrue things; that she was furious because Bill had been sued by Mrs. Roddy, because Mrs. Doak attended the trial with Mrs. Roddy; because Mrs. Thomas Graham had told testatrix that Mrs. Roddy had testified to something derogatory to her; that on the next morning Mrs. Doak and Mrs. Roddy were about to leave and were in a separate room talking to their father; that Mrs. Roddy had not known when she went into the New Mexico land deal with Bill that Bill owed her father a lot of money; that she asked her father how much Bill

owed him; that Mrs. Graham was in another room and nobody knew she was listening; that she rushed into the room where Mrs. Doak, Mrs. Roddy and Mr. Graham were talking; that Mrs. Graham was screaming, was "beside herself", and said she would like to slap them; that Mrs. Roddy just drew back and said, "I defy you"; that Mrs. Graham screamed that "all we came around there for was to get money;" that Mrs. Graham followed Mrs. Doak and Mrs. Roddy to the door screaming that "she was going to take her half of everything she and Daddy had and give it to Bill;" that Mrs. Roddy told her mother to go ahead and do that but that she didn't tell her mother, as other witnesses testified, that she despised her. Mrs. Doak testified that her mother was highly emotional and upset; that she had been like that all of Mrs. Doak's life. Mrs. Doak testified that about three days after her mother's funeral her father told her that her mother had left Mrs. Doak and Mrs. Roddy out of her will and had given their part to Tom's children and that their father said "I got her to do that, because I was afraid that she would have—that Bill would have her sign something worse, and I was afraid that she was going to give Bill a lot of money." Mrs. Roddy testified that Mrs. Doak's testimony with reference to the quarrel was correct; that she didn't know whether or or not she told her mother that she didn't want her money.

It is undisputed that Mrs. Graham had a strong will and was not easily influenced. The only evidence with reference to Mrs. Donica exercising influence on her mother was to the effect that when Mrs. Donica came to see her mother she tried to "boss" her mother about taking care of herself, telling her not to work and to rest more, and that Mrs. Graham resented it, and that she and her mother talked about contestants being excluded as beneficiaries of Mrs. Graham's will and that Mrs. Donica did not discourage it. The only testimony with reference to Mr. Graham's action that could be seriously considered on the question of

undue influence was that wherein he was quoted as saying that he got his wife "to do that" because he was afraid Bill would get her to do something worse. The necessary interpretation of the record relative to this matter is that Mrs. Graham was determined to exclude contestants as beneficiaries and that her husband thought it was better to leave that part of her money for the education of Tom's children than to give it to Bill.

■ Under the circumstances, we cannot say that the will made an unnatural disposition of the property. There was a reasonable basis for the exclusion of contestants and the inclusion of Tom's children. Curry v. Curry, 153 Tex. 421, 270 S.W.2d 208, 213; Lindley v. Lindley, (Sup.Ct.), 384 S.W.2d 676, 682.

In Curry v. Curry it was held that the fact that the beneficiary of a deed selected, advised and paid the attorney who wrote it and secured the services of the notary and witnesses would not support a conclusion that the deed was a product of undue influence. What was said in that case concerning the testimony relative to undue influence is applicable here, to-wit:

"* * * there is absolutely no intimation in the testimony of either witness of any force, intimidation, duress, excessive importunity, fraud, or other undue influence used or practiced by the defendant to overcome or subvert the will of the grantor and induce the execution of the deed against his wish. It has been held that one may request or even importune and entreat another to execute a favorable dispositive instrument, but unless the importunities and entreaties are shown to be so excessive as to subvert the will of the maker they will not taint the validity of the instrument with undue influence."

Our Supreme Court in Rothermel v. Duncan, 369 S.W.2d 917, in effect decided in favor of appellees the question presented here. In that case testatrix' will left the entire

estate to one son. A jury found that the will was the product of undue influence exercised by that son. The court held there was no evidence of probative force to support that finding. We think the facts in the Rothermel case were much stronger for the contestant than they are in this case. Appellees make a fair comparison of the Rothermel case and this case, which is in substance as follows:

1. Here the attorney who wrote the will was employed by Mr. Graham, who gave him instructions as to its contents during several conferences before its execution by Mrs. Graham. In the Rothermel case the proponent son and sole beneficiary of the will wrote it without consulting anyone.

2. Mrs. Graham did not see the will until it was completed. Mrs. Rothermel did not see the will until it was completed.

3. The attorney read the will to Mrs. Graham at her request and after it had been read she said "that's fine" and then signed it. Mrs. Rothermel signed her will without question, suggestion or comment. No one read or explained the will to her and no one saw her read it.

4. Mrs. Graham was seventy seven years of age. She suffered from various physical ailments. She was able to work in her yard and be up and around the house and to go to Abilene to execute the will. She lived for twenty months after its execution. Mrs. Rothermel was hard of hearing, her eyes were bad, her hands shook and she suffered from arthritis and diabetes. Her condition required care and companionship. She was ninety three when she executed the will and she died about nine months thereafter.

5. After Mrs. Graham executed the will it was delivered to either Mr. or Mrs. Graham and kept at their home under their joint control. Mrs. Graham showed it to one daughter and told her sister and a daughter-in-law of its contents. The Rothermel will was kept by the sole beneficiary, the proponent son, in his safety deposit box, subject to his exclusive control until after his mother's death.

6. Mrs. Graham lived in town, was visited daily by friends, and frequently by contestants. Mrs. Rothermel lived with said son's employee on his farm and was rarely visited.

7. Here there was a quarrel between testatrix and contestants shortly before execution of the will and this was one of a series of disagreements over many years. She then told contestants she was going to give all her property to Bill. After the quarrel, Mrs. Graham talked of disinheriting contestants. The Rothermel family was a closely knit one. Testatrix loved the children of her two sons equally and she declared to disinterested witnesses that she intended to leave her estate to her grandchildren equally.

8. Neither of the parties charged with exercising undue influence that caused the exclusion of contestants benefited therefrom. In the Rothermel case, the proponent son, who wrote the will and was charged with exercising undue influence to procure execution of a will that gave him everything was the sole beneficiary of any undue influence.

In the Rothermel case the Supreme Court said:

"* * * before a testament may be set aside on the grounds of undue influence the contestant must prove: (1) the existence and exertion of an influence; (2) the effective operation of such influence so as to subvert or overpower the mind of the testator at the time of the execution of the testament; and (3) the execution of a testament which the maker thereof would not have executed but for such influence. See: Stewart v. Miller, Tex.Civ.App. (1925), 271 S.W. 311, wr. refused; Olds v. Traylor, Tex.Civ.App. (1944), 180 S.W.2d 511, wr. refused.

"The burden of proving undue influence is upon the party contesting its execution. It is, therefore, necessary for the contestant to introduce some tangible and satisfactory proof of the existence of each of the above stated elements of undue influence. Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138.

"It cannot be said that every influence exerted by one person on the will of another is undue, for the influence is not undue unless the free agency of the testator was destroyed and a testament produced that expresses the will of the one exerting the influence. Long v. Long, supra. Indeed it has even been held that one may request or even importune and entreat another to execute a favorable dispositive instrument; but unless the importunities and entreaties are shown to be so excessive as to subvert the will of the maker, they will not taint the validity of the instrument with undue influence."

The record shows that during the quarrel that shortly preceded execution of the will Mrs. Graham announced to contestants that she was going to give everything to Bill and thereafter talked of disinheriting them. There is evidence that she talked with her husband about execution of the will; that he suggested that she leave one third of her estate in trust for the education of Tom's seven minor children. It was not shown that there was anything improper in the discussion of the disposition of her estate by the testatrix with the man to whom she had been married for fifty seven years. There is no evidence tending to show that Mr. Graham or Mrs. Donica caused Mrs. Graham to exclude the contestants from the benefits of her estate. There is no evidence that she did not desire to do so or that those charged overcame her will. There is not the slightest indication that she would not have excluded contestants but for the influence of Mr. Graham and Mrs. Donica. The circumstances relied upon by a contestant as establishing the elements of un-

due influence must be of a reasonably convincing and satisfactory character and they must not be equally consistent with the absence of the exercise of such influence. Barksdale v. Dobbins, Tex.Civ. App., 141 S.W.2d 1035, (Writ Ref.); Stewart v. Miller, 271 S.W. 311 (WR).

We hold there was no evidence to support the findings that Mr. Graham or Mrs. Donica unduly influenced the testatrix to execute this will. All of appellants' points have been considered and are overruled.

Appellees present in the alternative points that the evidence is insufficient to support the jury findings or that said findings are against the overwhelming preponderance of the evidence. Because they could become material, we also pass upon and sustain those points. Barker v. Coastal Builders, Inc., 153 Tex. 540, 271 S.W.2d 798.

The judgment is affirmed.