**CLOUDT et al. v. HUTCHERSON.**

No. 4298.

Court of Civil Appeals of Texas. El Paso.

June 3, 1943.

Rehearing Denied June 24, 1943.

C. H. Gilmer, of Rocksprings, Morriss & Morriss, of San Antonio, Hughes, Hardeman & Wilson, of San Angelo, and Maurice R. Bullock, of Fort Stockton, for appellants.

Wm. H. Burges, of El Paso, on the brief, Collins, Jackson, Snodgrass, & Blanks, of San Angelo, L. W. Elliott, of Sonora, and Johnson & Crumpton, of Fort Stockton, for appellee.

PRICE, Chief Justice.

This case involves the contest of the will and codicil of Clara Kirkland, of Sutton County, who died there August 16, 1941. She left an estate consisting of ranch, livestock, town property, notes, cash and other personalty. The estate was of

large value. The will and codicil in question were filed for probate in Sutton County August 19, 1941, by B. W. Hutcherson, named as independent executor in the will. The contestants were nieces and nephews of the testatrix. The grounds of contest urged were mental incapacity, undue influence, fraud and deceit, and lack of knowledge and understanding of the contents of the will and codicil. The will and codicil were ordered probated by the County Court. Contestants appealed to the District Court, a change of venue was had to Pecos County District Court, where a trial before a jury was had, resulting in verdict and judgment in upholding the will, but denying probate to the codicil. Contestants have appealed from this judgment.

Contestants are all the heirs at law of the testatrix, and most, if not all, are either nieces or nephews of the testatrix. Proponents of the will are unrelated either by blood or marriage with the testatrix. Testatrix was a widow at the time of her death, her husband having predeceased her a few years. There were no children born of testatrix' marriage, and she never had any children.

The will probated is dated April 25, 1938, when Mrs. Kirkland was about seventy-five years of age. It was witnessed by Ralph Trainer and W. D. Martin. This will, as written on that date, disposed of her estate as follows: To contestant Erich Cloudt all notes signed by Walter, Frank, Otto and R. H. Cloudt; to Mrs. B. W. Hutcherson certain specified china dishes and table ware; to Mrs. Lee Holland property in Sonora, Texas (this property was of considerable value); to Wilma Hutcherson Friend, the ranch property situated in Sutton County, Texas, and all livestock and improvements on said ranch or ranches; likewise specifically was left to said devisee a bequest of a large cedar chest, diamond ring and brooch. Likewise there was a residuary clause in her favor. B. W. Hutcherson was named as executor. This will was typewritten. Soon after the signing and witnessing thereof the name of Erich Cloudt was stricken from the will, and in the place thereof was written the name of B. W. Hutcherson; so in the case of the devise to Mrs. Lee Holland. One witness at least testified these two alterations were in the handwriting of the testatrix. However, no witness testified as to having seen testatrix make the alterations.

The codicil purports to have been executed on the 11th day of December, 1939, and witnessed by Jessie Johnson and L. E. Johnson. This codicil recites the testatrix had substituted the name of B. W. Hutcherson in her own handwriting in the third and ninth paragraphs of the will to B. W. Hutcherson.

Neither B. W. Hutcherson nor Mrs. B. W. Hutcherson was related to testatrix by blood or marriage; so as to Mrs. Wilma Hutcherson Friend, who was a daughter of Mr. and Mrs. B. W. Hutcherson.

The jury found, in response to special issues, substantially as follows:

(1) Mrs. Kirkland had testamentary capacity when she executed the instrument dated April 25, 1938.

(2) Mrs. Kirkland knew and understood the contents and provisions of the will dated April 25, 1938 when she signed it.

(3) Mrs. Kirkland was not caused to execute the instrument dated April 25, 1938 by the exercise of undue influence upon her by B. W. Hutcherson or by anyone for or with him.

(4) Mrs. Kirkland did not have testamentary capacity at the time she executed the codicil dated December 11, 1939.

(5) At the time she executed the codicil dated December 11, 1939, she did not know or understand the contents and provisions thereof.

(6) She was not caused to execute the codicil by the exercise of undue influence upon her by B. W. Hutcherson or by anyone acting for or with him.

(7) The codicil was not procured by fraud upon the part of B. W. Hutcherson.

There are no points of error urged as to the form of the issues submitted or the definitions and explanations given in connection with the issues.

Contestants urged in their brief twenty-three points of error.

At the close of the evidence plaintiffs presented a request for an instructed verdict in their favor. This being overruled, after the verdict was returned, a motion for judgment non obstante veredicto was made, which was likewise overruled. Error is assigned to the action of the trial court in this respect. The contention being that the evidence, as a matter of law, was insufficient to show that testatrix was possessed of testamentary capacity at the time

of making the will of April 25, 1938. Further, as a matter of law, under the evidence, testatrix did not know the contents of that instrument at the time she executed same. Again, the evidence established, as a matter of law, that the will was executed through undue influence.

If any of these three contentions are sustained by the record, the will, as a matter of law, of course, was not entitled to probate. In our opinion, none of these contentions, as applied to the will as executed on April 25, 1938, are borne out by the record.

In regard to testamentary capacity, it appears that at the time the will was executed, the testatrix was about seventy-five years of age,—in addition, was suffering from disease. Numerous lay witnesses testified that in their opinion testatrix was of sound mind. Their opportunities of observation varied as to time and closeness of association with testatrix. On the other hand, numerous witnesses testified that in their opinion the testatrix was of unsound mind. Medical witnesses on behalf of the proponents gave as their opinion that the testatrix was of sound mind. Other medical experts on behalf of the contestants gave it as their opinion the testatrix was of unsound mind.

■ The best that can be made of this state of the evidence was that there was an issue raised as to testamentary capacity for the jury. As to whether or not testatrix knew of the contents of the will at the time thereof, we think, if the issue was raised by the evidence, that there was ample evidence to justify the trial court in submitting same to the jury.

■ The testimony of witnesses Lowrey and Mrs. Vicars was practically to the effect that testatrix came to the office of Lowrey for the purpose of having him prepare the will in question; that she had a former will with her; that she suggested the provisions of the will, and that the will was written as she directed; that after the will was transcribed she had same in her possession for a length of time sufficient to have read same, and that she did so do. Contestants contend that it is shown by the evidence that her education was rather meager, and she did not have the ability to read and understand the will.

The most that can be said of contestants' position is that perhaps this issue was raised by the evidence.

■ On the question of undue influence, the position of contestants is that the undisputed evidence proved B. W. Hutcherson was in a position of trust and confidence as to the testatrix, and that the will being in favor of his daughter, the burden was upon proponents to show that it was not procured by his undue influence. What is hereafter said applies only to the will of April 25, 1938, and not to the codicil of December 11, 1939. Even though this principle should be held to apply, we think the evidence was sufficient to testify the submission of the issue to the jury. There is evidence that on April 25, 1938, the testatrix came to the office of J. D. Lowrey, the County Clerk, to get him to write her will; when she came to the office she was not accompanied by B. W. Hutcherson; that she gave directions as to the provisions of the will; that same were carried out in the typing of the will; that she thereafter requested Lowrey to accompany her to obtain witnesses of her own selection thereto. There is no direct evidence that Hutcherson or anyone on his behalf exercised undue influence over the testatrix at the time she executed the will in question. It is not directly shown Hutcherson suggested the will or had anything to do with its preparation.

If there is an issue of undue influence as to the will of April 25, 1938, it is to be found in the following circumstances: In the provisions of the will itself the bulk of the estate was left to Mrs. Wilma Hutcherson Friend, the daughter of B. W. Hutcherson; that at the time same was made B. W. Hutcherson had some outstanding judgments against him, and if the property had been given to him, the liens thereof might have attached thereto; that the relations between Mrs. Friend and testatrix were not such as to render her a recipient of testatrix' bounty to the extent that the will provided; that out of her ample estate testatrix, to her relations, gave to one of them only a bequest. This bequest, however, was rather substantial. Unquestionably Hutcherson had for sometime attended to many of the testatrix' business affairs, and her expressions indicated that he had great influence over her actions in relation thereto. Further, it is evidence as to a deteriorated mental and physical condition.

■ In the matter of the codicil, the finding of the jury was against the exercise of undue influence on the part of B.

W. Hutcherson. However, as to that, there is evidence that would justify a finding that such influence was either exercised or sought to be exercised. Hutcherson had the codicil prepared. He was sheriff of the county, and his deputy and his deputy's wife were witnesses to the codicil. The codicil was in his favor. As to the property purported to be affected by the codicil there is evidence before its execution the testatrix had conveyed same to him—had conveyed it perhaps without consideration. We think these subsequent matters were entitled to be taken into consideration on the issue of undue influence exercised by Hutcherson in obtaining the will of April 25, 1938. Considering the evidence as a whole, we think as to the will of that date the issue of undue influence was in the case. Long v. Long, 133 Tex. 96, 125 S.W.2d 1034; Id., Tex.Civ. App., 129 S.W.2d 1206. However, if raised by the evidence, undue influence was not established as a matter of law.

Contestants seek the reversal of this judgment as to probating the will on grounds of misconduct of the jury, depriving them of a fair and impartial trial of the case.

It appears from the statement of facts that one of counsel for proponents, actively participating in the trial, on two occasions during the progress of the trial played golf with two at least of the jurors; that trifling bets were made during the progress of the game as to the results of various stages thereof; that the lawyer won something like ten or fifteen cents from one or more of the jurors. Prior to these two incidents, such counsel for the proponents had known the jurors for a long time and had played golf with them habitually. Contestants prior to accepting these jurors on the panel knew that they were well acquainted with such counsel for proponents, but there is no evidence that they knew anything about the golf games prior to the time the jury returned their verdict. The jurors deny mention of the case at the time in question, as did the attorney involved. The jurors likewise deny that their verdict was in any way influenced by the incident.

Dr. Johnson testified as a medical expert on behalf of the contestants. It does not appear that he ever personally knew the testatrix, and his opinion that she was of unsound mind on April 25, 1938 was founded solely on the basis of hypothetical questions. In connection with showing his qualifications contestants proved by him that for eight years he was superintendent of a hospital for insane in Austin, Texas, and for sixteen years he was superintendent of the San Antonio State Hospital; that after the direct examination had been concluded, counsel for contestants, during a recess, inquired of counsel for defendants, in the presence of the Judge, in substance, if they intended to interrogate Dr. Johnson in regard to certain charges made in a hearing before the State Board. In substance, counsel for proponents declined to make any statement, and we think the record sufficient to show, impliedly at least, that the Judge was asked to direct counsel not to make any such inquiries, and that the Judge declined to forbid the asking of the questions of the general tenor complained of. On cross-examination, one of the questions asked Dr. Johnson was in substance as to whether he was willing to state as to why the State Board refused to renew his contract as superintendent. Objection was made and promptly sustained.

During the course of the trial a juror by the name of Alford told several of the other jurors that Dr. Johnson had been in trouble before the Board of Control because of his improper advances toward women at the San Antonio Hospital, and referred to Dr. Johnson as the "son of a bitch," and said in substance that he had been fired. Counsel for contestants knew, or some of them knew, that there had been a rather sensational proceeding in relation to Dr. Johnson before the State Board of Control—perhaps knew that that proceeding had terminated as indicated in the case of Knox v. Johnson, Tex.Civ.App., 141 S.W.2d 698 holding that the State Board of Control had no power or authority to remove him as superintendent of the San Antonio State Hospital. It was shown that some of the jurors had read something about the proceeding of Dr. Johnson before the State Board. One at least of the jurors had not read the papers relative to such proceeding, to whom the juror Alford made statements in substance as above indicated.

The jury had been out for sometime, and communicated with the court in writing that they were hopelessly deadlocked and could not arrive at a verdict. The jury were brought into open court and the Judge interrogated them as to how they were numerically divided. The foreman, and

perhaps one other juror, informed him that they were evenly divided on the issues, and they thought that there was. no hope of their arriving at a verdict. The Judge, in substance, told them that he did not want to hold them an undue length of time, but thought they should deliberate further; that the trial of the case entailed great expense to the county and the parties litigant, and sent them back to consider further of the verdict. After they retired to the juryroom, juror R. H. Gray, who was a former County Judge, stated to the jury that they ought to get together on some verdict; that if they did not do so it would require a whole new trial, and that a new trial would cost from twenty to twenty-five thousand dollars to be paid out of the estate by whoever would get it; also that the estate would be eaten up or be subject to much attorneys' fees and court costs and it would likewise be expensive to the county to have a new trial; that it didn't matter how the jury answered the questions as the case would be appealed and the higher court would correct any mistakes made by the jury. Several of the jurors who had theretofore voted to answer Issues Nos. 1 and 2 "No," and No. 3 "Yes," testified that they changed their votes on account of Judge Gray's statements, and but for their reliance would not have changed their votes. There was also some testimony tending to show that some at least of the jurors agreed to change their votes on Issues Nos. 1, 2 and 3, provided the verdict was against the codicil.

In regard to the golf-playing incident, the facts are undisputed. Prior to the enactment of Rule 327, Texas Rules of Civil Procedure, we take it that the assignment would have presented reversible error. Texas Milk Products Co. v. Birtcher, 138 Tex. 178, 157 S.W.2d 633; Campbell v. Struve, Tex.Civ.App., 30 S.W.2d 344; Gulf, C. & S. F. R. v. Matthews, 28 Tex. Civ.App., 92, 66 S.W. 588. We are constrained to the belief that it was the association that was condemned in the cited cases, rather than the trifling benefits.

Later in a general discussion the effect of that rule will be considered as to each ground of misconduct shown.

In regard to the communication to the jury affecting the credibility of Dr. Johnson, this, too, we think, would have necessitated a reversal prior to the enactment of Rule 327. Elizondo v. Reagan, Tex.Com. App., 55 S.W.2d 540.

There is a distinction between the instant case and Elizondo v. Reagan, supra. There, the witness whose credibility was affected gave testimony as to the direct facts in issue. Here, the witness was an expert and testified only as to his opinion. The value of this opinion is to be measured by the existence of the facts upon which it was based, his skill and the integrity of the opinion. Under this decision we think in. a case of close issue, it was error for the jury to receive a communication having a tendency to seriously reflect on the character of an expert witness. Especially is this true where the question of testamentary capacity is involved. An opinion by a skilled expert on mental diseases is entitled to careful and serious consideration by the trier of the facts.

■■ That the jury should not be influenced in arriving at a verdict by consideration of expense seems to be settled by our decisions. If excepted to, it has been held that.it is error for the trial court to suggest this as a basis or reason for the jury to arrive at a verdict. Here, the court's directions, or rather suggestions, were made in the presence of counsel for contestants. No exceptions were reserved. This error was, we think, waived. At the time same was given, it was impossible to say whether same would benefit or injure the contestants.

■ This waiver does not foreclose the matter in regard to juror Gray's communications to the jury as to the amount of expense entailed by another trial. It is undisputed he said it would cost from twenty thousand to twenty-five thousand dollars; further that the expenses and attorneys' fees would come out of the estate.

The acquiesced in charge of the court might reasonably be calculated to provoke a consideration and perhaps a discussion of the subject of expenses. There is no evidence before the jury as to the amount thereof. Juror Gray, as an ex-county judge, might be presumed to speak thereof with knowledge and authority beyond that of the ordinary juror. It was not, however, a communication relating to a fact in issue or having a remote bearing on any fact in issue. True, a verdict followed closely after the suggestions of the court and the communication of the juror. Further, it is complained, the juror Gray, to emphasize the importance of arriving at a verdict, told his fellow jurors that if

mistakes were made in arriving at a verdict, same would be corrected on appeal.

■ It has been held that where a juror finds on issues in pursuance of the belief brought about by misconduct that the findings were immaterial, that this presents reversible error. A mistake, however, we think, presupposes an honest exercise of the best judgment. As to the communications made by juror Gray, if they were the only misconduct shown, we would be loath to disturb this verdict for same. In order to do so, under Rule 327, it would be necessary for us to find that it reasonably appears that probable injury resulted therefrom. We do not believe this is warranted from the pertinent record taken as a whole.

The correct disposition of the other assignments involving misconduct and communications received depends upon the construction and application of Rule No. 327. The cases we have heretofore cited were disposed of while Art. 2234, R.S.1925, was in force. All of this article was incorporated into that rule, with this addition: "* * * and if it reasonably appears from the evidence both on the hearing of the motion and the trial of the case and from the record as a whole that injury probably resulted to the complaining party."

In terms the rule, as the superseded statute, restricts the power of the court to grant a new trial on the ground specified. Under the statute the appellee must exclude beyond reasonable doubt the injurious effect of proven misconduct. A new standard is prescribed by Rule 327 in passing upon the effect of misconduct. First, the burden is placed upon the complainant to reasonably show that the proven misconduct resulted in probable injury.

■ The statute and the rule were each enacted, we think, to the end that the right of trial by jury should remain inviolate and to maintain the purity and efficiency thereof. See Sec. 15, Art. 1, Constitution of Texas, Vernon's Ann.St.

The uniform and consistently adhered to construction of Art. 2234 was that if any of the grounds enumerated therein were proven, it was the duty of the trial court to grant a new trial, unless it appeared from the testimony heard and the whole pertinent record beyond a reasonable doubt that injury did not result to the complainant. Further, if complainant proved the

misconduct, the result became an issue of law—an issue which the Supreme Court had the power and duty to decide. The standard adopted by that Court for itself and for all other courts was the exclusion by "the prevailing party" of a reasonable doubt of harmful results.

Now, no doubt, Rule 327 was intended to make a change in the matter of the granting of new trials on the ground specified in the statute and in the rule. The new rule not only changed the burden from appellee to appellant, it changed the standard of proof required—required that before appellant be entitled to a new trial, it must reasonably appear that probable injury was the result of the misconduct or communication complained of. Before, to sustain the judgment, the appellee must establish beyond reasonable doubt that injury did not result from proven misconduct.

■ We do not think that it changed the law as expounded in the decisions construing Art. 2234, that the result of proven misconduct is an issue of law. It was not intended, we think, to deprive the Supreme Court or the Courts of Civil Appeals from passing one same as an issue of law. It was not intended that the finding by the trial court that probable injury did not result, even though there is a conflict in the proof thereof or different inferences may be drawn from the evidence, should absolve the appellate courts from the duty of determining the question. We cannot believe the Supreme Court intended to relinquish its power and duty to see that the right of trial by jury remain inviolate and to protect its purity and efficiency.

In the trial of the issue arising on a motion for a new trial on the grounds specified in the rule, the ultimate issue is as to whether or not the trial was materially unfair. The infringement of a right not resulting in injury should not condemn a trial as unfair. It does not affect either the purity or efficacy of a jury trial. The determination of whether or not probable injury reasonably appears in the trial is no more a determination of a question of fact than the determination whether or not it appears beyond a reasonable doubt that injury did not result. Where it reasonably appears that the trial was materially unfair, the judgment should be reversed.

■ We conceive it to be our duty to determine from the evidence heard on

the motion for a new trial, on the trial of the cause and the record as a whole, whether or not it reasonably appears that injury probably resulted to contestants. In this consideration not a feather's weight will be given to the testimony of a juror that an improper communication or proven misconduct did or did not influence him in arriving at his verdict. Sproles Motor Freight Lines v. Long, 140 Tex. 494, 168 S.W.2d 642.

Considering the evidence as a whole, there was a sharp conflict on the issue of testamentary capacity of the testatrix at the time of the execution of the will of April 25, 1938,—conflicting to such an extent, we think, that a finding by the jury on that issue either way should not be disturbed as against the preponderance of the evidence. The issue of undue influence as to that will, as we have stated, was raised by the evidence we think. The verdict was against contestants on these material issues. The evidence heard on the motion for a new trial shows that the jury, for a considerable length of time, were equally divided thereon.

■■■ Turning now to the specific grounds urged, first, as to the golf-playing incident, wherein one of counsel for proponents and two or three of the jurors played golf together on two separate occasions while the trial was in progress, the evidence heard on the motion seems to establish that each of these three jurors at all times voted to answer the issues in respect to the will in favor of the proponents. One of these jurors made statements to other jurors affecting the character of an expert witness offered by contestants. On one occasion, when speaking of this witness, applied a vile epithet, evidencing a contempt that he seemed otherwise unable to express. This juror did not testify on the motion for a new trial. Regardless of the high esteem in which counsel participating in these incidents is held, regardless of our established belief from this record of his entire want of intention to in any way influence the jurors, or any one of them, by association outside the courtroom, we are constrained to hold that as a matter of law it reasonably appears that probable injury resulted. To make it appear that injury probably resulted, it is not necessary that same be shown with certainty. The harmful tendency of such association between counsel and jurors

during the progress of the trial has been too often discussed to justify further elaboration thereon. To show a harmful result with certainty is practically impossible short of proof of actual corruption or the most gross impropriety. In our opinion the assignment presents reversible error.

■■■ In regard to the communication by juror Alford to some of the jurors affecting the credibility of Dr. Johnson, this juror communicated purported facts which he purported to know which, if true, would probably affect in the minds of the average jury the credibility of the witness. These purported facts aroused in the mind of the juror Alford an unmeasurable contempt for this witness. This contempt was sought to be expressed by the epithet that the juror used in describing the witness. There is nothing in the record to indicate any other ground of the feeling of the juror toward the witness. He coupled the epithet with numerous of the purported misdeeds and disgraceful conduct of the witness. This communication would not have been admissible in evidence. It is not a case of an undisclosed acquaintainship of the juror affecting his attitude. See Elizondo v. Reagan, Tex.Com.App., 55 S.W.2d 540, loc. cit. par. 3, p. 542. The workings of his mind in arriving at a conclusion are disclosed by his declarations. One at least of the jurors testified that he had not heard of the proceedings before the State Board of Control involving the witness Dr. Johnson. In another it awakened latent recollections of what he had read.

Proponents contend that the contestants put Dr. Johnson on the stand, knowing of the general notoriety of the proceedings before the Board. Hence they cannot complain of this discussion among the jurors. Counsel for contestants did in a general sort of way have knowledge thereof. Proponents, on the other hand, by unjustified questions propounded to the witness, to an extent reasonably invited the discussion. Their first question on cross-examination was: "Doctor, isn't it true that your own mentality has been publicly questioned?" "Doctor, do you have any objection in telling this jury why your contract as superintendent was not renewed?" This, in view of the fact that contestants had theretofore unsuccessfully sought to prevent proponents from asking on cross-examination questions of this general nature. The jurors

had sworn to try the case under the law as given them in charge by the court and the evidence admitted under the rules of the court. It cannot be doubted for a moment that if, over the objection and exception of contestants, proponents had offered testimony as to these proceedings before the Board involving Dr. Johnson, that reversible error would have been committed. Juror Alford stated same to some of the jurors without the restrictions ordinarily incident to the introduction of testimony. On his mind at least is palpably disclosed the effect of matters, the knowlege of which was acquired outside of the courtroom. His communications to the jury present reversible error.

On another trial a general cautionary instruction to the jury might lessen the danger of a recurrence of the matters complained of in this assignment.

█ The statement of counsel in argument in regard to the incompetency of B. W. Hutcherson, proponent, to testify as to transactions with the deceased was improper. Brackenridge v. Roberts, 114 Tex. 418, 267 S.W. 244; Johnson v. Durst, Tex.Civ. App., 115 S.W.2d 1000; Ashmore v. Pike, Tex.Civ.App., 108 S.W.2d 276; Vetter v. Nicholson, Tex.Civ.App., 121 S.W.2d 1024; Gray v. Cheatham, Tex.Civ.App., 52 S.W. 2d 762.

█ The discussion among some of the jurors as to whether Hutcherson was competent to testify was improper. Further, jurors should not discuss the case, even with fellow jurors, save when they are functioning as a jury. A cautionary instruction along this line might tend to promote the efficiency of jury trails.

█ We think the witnesses for proponents were competent to testify as to their opinion of the soundness of the mind of testatrix based on their association and conversation with her. The fact that her conversation and observed conduct were those of a person of sound mind was sufficient basis for the opinion that she was of sound mind.

All points of error urged by contestants have received careful consideration, and those not discussed are overruled as not presenting reversible error.

The judgment as to the will is reversed and the cause remanded for a new trial. Insofar as it declares the invalidity of the codicil it is in all things affirmed.

## On Rehearing

There are several requests in appellee's motion for rehearing that some statements of fact made in the original opinion herein be corrected. Exception is taken to the statement that at the time the will was executed appellee had some outstanding judgments against him. That there was some evidence of this fact we think is a fair inference from appellee's own testimony. We substitute for the expression objected to the statement that there was some evidence that appellee had outstanding judgments against him at such time. It might be further added that, under his testimony, in 1939 he owed considerable money, and would not state that such amount was less than $30,000; further, he stated that in 1939 he had no property standing in his name. These circumstances were mentioned, not as having great weight, but as offering an explanation as to why the devise of the most valuable portion of the estate was made to his daughter rather than directly to him.

It is asserted that the statement in the opinion that after the statements of Judge Gray, "several of the jurors who had theretofore voted to answer Issues Nos. 1 and 2 'No,' and No. 3, 'Yes,' testified that they changed their votes on account of Judge Gray's statements," should be modified. The ground urged is that the trial court found that Issues 1, 2 and 3 had all been answered before Judge Gray made the statements in question.

No findings of fact appear in the record, hence we infer that the contention is that such finding is to be inferred from the overruling of the motion. Several of the jurors testified as to the facts as stated in the opinion. Furthermore, when the jury appeared in open court to report the impossibility of arriving at a verdict, it was stated the jurors were evenly divided on the issues submitted. Judge Gray's statements followed shortly after their return to the juryroom, and in a comparatively short time a verdict was reached.

It was stated in the original opinion that there was some testimony tending to show that some of the jurors changed their votes on Issues Nos. 1, 2 and 3 by virtue of an agreement among the members of the jury that the verdict should be against the codicil. From the overruling of the motion for a new trial, we think it may be fairly inferred that the court found there was no such agreement.

We gladly correct the statement that soon after the execution of the will changes or alterations were made therein. The evidence was that at sometime after the execution of the will the alterations were made. The only evidence as to by whom same were made was by the testimony of the witness Lowrey, who said the changes made were in the handwriting of the testatrix.

In the course of his motion appellee rather plangently insists that this court point out any evidence raising the issue of undue influence. Under the heading "Concluding Remarks," it is asserted the assignment was that as a matter of law undue influence was established by the evidence, hence this court should not have discussed the question as to whether undue influence was raised as an issue. In discussing as to whether the evidence amounted to proof of undue influence, it is difficult to avoid considering whether or not it was sufficient to raise the issue.

We shall attempt to briefly discuss, in a general sort of way, some of the evidence. It is realized that the question is close. In this discussion we shall refrain from pointing out evidence mentioned in the opinion, except in a general way. The age and infirmity of the testatrix are to be considered, the confidential relationship existing between testatrix and appellee likewise; the apparent unnaturalness of the will. These, while cogent circumstances, are not in and of themselves sufficient to raise the issue. What we shall hereafter say relates to matters occurring subsequent to the execution of the will of April, 1938.

Mrs. Culp was an employee of the testatrix, having been secured, together with her husband, by appellee for her. She testified, in substance, that she spoke to appellee in regard to quitting. In part, as to this conversation, she testified: "He said * * * it would be quite a hardship on him at that time to try and get someone else. He also said he knew it was a hard proposition all right,—hard to do. He said if we would go ahead and try to please the old lady, get along with her, he said: 'Of course, it's like a gambling wheel, you could not tell where it would stop, but if it came his way, he would try to see that we were taken care of.'" This, perhaps, is entitled to slight weight.

It cannot be contended, we think, there was no evidence that there was not undue influence in obtaining the transfer of the vendor's lien notes, in obtaining the execution of the codicil. The transfer of the notes was drawn by appellee's own order, and so was the codicil. There is wanting evidence that the testatrix ever directed the drawing of either. Each was promptly signed by the testatrix. The witnesses thereof were deputies of the appellee. It is inferable, we think, that appellee sent one of the witnesses to this codicil for the purpose of witnessing same. That the testatrix readily signed papers which appellee caused to be presented to her is evidenced with reference to the property in Sonora. This property was deeded to appellee by testatrix. He subsequently mortgaged same to an insurance company. This is the same property that was purportedly devised to him by the codicil. There is some evidence, we think, that a false consideration was recited—that there was in fact no consideration. Further there was some evidence from which it might be inferred that testatrix was ignorant of the fact she had ever signed the deed. This will, very shortly before the execution of the codicil was sought, was in the custody of the appellee. How long, the evidence fails to show.

From the evidence, taken as a whole, it might be inferred that the design was in the mind of appellee to acquire all of the property of any substantial value for himself and his daughter. Nor do we think there is an entire lack of evidence of overt acts on his part to carry out this design. He caused the codicil to be drafted and the transfer of the vendor's lien notes, and each instrument to be presented to testatrix for execution—presented and witnessed by his official deputy.

It is asserted that all these were subsequent to the execution of the will. This is true, but still we are of the opinion that all were admissible in evidence. Each cast its shadow backward. Beadle v. McCrabb, Tex.Civ.App., 199 S.W. 355 (writ denied).

 Undue influence may be established by circumstances as well as direct evidence. Mayes v. Mayes, Tex.Civ.App., 159 S.W. 919; Holt v. Guerguin, Tex. Civ.App., 156 S.W. 581; Leahy v. Timon, Tex.Civ.App., 204 S.W. 1029; Id., 110 Tex. 73, 215 S.W. 951.

 We do not overlook that the testimony of the witnesses Lowrey, Trainer and Mrs. Vicars makes a strong showing

that the will was free from undue influence; further, we have kept in mind the principle that undue influence must be in operation at the very time of making the will, and the will result therefrom. Viewing this evidence as a whole, we adhere to the view that the issue was raised by the evidence. This elderly and infirm lady had a right to make a will, if she was endowed with sufficient mental capacity. Within the content of her right was the right to make same in accordance with her untrammeled desire. Whether she had requisite mental capacity under the evidence was an issue for the jury, and also, we think, whether same represented her untrammeled desire.

We think there is no merit in the contention that if the judgment of the trial court be reversed as to the will, it should likewise be reversed as to the codicil. The issues are separate and distinct.

The motion is overruled.

WALTHALL, J., not participating.