Addie Adele FURR, Appellant,

v.

E. E. FURR et al., Appellees.

No. 16732.

Court of Civil Appeals of Texas.

Fort Worth.

May 13, 1966.

Anderson & Connell, and Jack Connell, Wichita Falls, for appellant.

Thornton & Thornton, and E. G. Thornton, Olney, Nelson, Montgomery & Robertson, and Allan D. Montgomery, Prothro & Sellers, and Lee Sellers, Wichita Falls, for appellees.

## OPINION

RENFRO, Justice.

This is a will contest case.

The will in question was admitted to probate in the County Court of Young County upon the application of Addie Adele Furr, daughter of the testatrix, Fannie Belle Furr. The will was probated over the contest of E. E. (Ellis) Furr and G. F. (Grover) Furr, sons of Fannie Belle and brothers of Addie Adele. Appeal was perfected to the District Court where a jury found that Fannie Belle Furr was unduly influenced at the time of the making of the will by Addie Adele Furr.

Addie Adele Furr's motion for judgment was overruled and judgment entered for E. E. and G. F. Furr.

Addie Adele Furr appealed.

The issue before this court is whether the record contains any evidence of probative force to support the finding of the jury that undue influence was exercised by Adele in the execution of the will of Fannie Belle Furr.

Bear in mind that the jury has found such undue influence. We must therefore indulge the presumption that the jury believed and accepted all probative evidence to sustain its verdict. Long v. Long, 133 Tex. 96, 125 S.W.2d 1034 (Sup., 1939).

In Rothermel v. Duncan, 369 S.W.2d 917 (1963), the Supreme Court held: "* * * before a testament may be set aside on the grounds of undue influence the contestant must prove: (1) the existence and exertion of an influence; (2) the effective operation of such influence so as to subvert or overpower the mind of the testator at the time of the execution of the testament; and (3) the execution of a testament which the maker thereof would not have executed but for such influence."

The statement of facts is somewhat voluminous. Much of the testimony is cumulative. We have endeavored to summarize below the material evidence tending to support the jury finding.

At the time of the execution of the will Mrs. Furr was 71 years of age, in poor health, and weighed about 100 pounds. The will bequeathed all her property to Adele with provision that if Adele predeceased testatrix all the property would go to the Methodist Orphans Home and the Boys Ranch.

Nothing was bequeathed to her two sons and five grandchildren.

Adam Furr, husband of Mrs. Fannie Furr, and father of appellant and appellees, died intestate July 3, 1958, possessed of considerable property.

Within days, or weeks, a family conference was held to discuss Adam's estate.

The conference was not a peaceful one, and from that time feelings between appellant and appellees grew from bad to worse.

For several years preceding Adam's death, Adele, a single woman, lived with her parents on the home farm. After Adam's death she continued to live on the farm with her mother.

Following the death of her father, Adele claimed her father had given her a farm in Archer County. Her brothers denied such gift had been made. Litigation ensued between Adele and her brothers.

The evidence shows that Mrs. Furr "From time to time discussed each and every one of her children and how she wanted to take care of those children."

Adele made frequent visits to her lawyer in company with Mrs. Furr preceding the execution of the will. Mrs. Furr discussed with the attorney, in the presence of Adele, her proposed will and other business. On the date the will was executed Adele went with Mrs. Furr to the attorney's office but left before the actual execution of the instrument.

Appellee Ellis Furr testified that following his father's death a dispute arose concerning property appellant claimed as a gift; when Mrs. Furr was in the hospital he attempted to see her but appellant ordered him to stay out of the room, called upon a man named Frank to stand in the door and keep him out of the room.

The witness Juanita Furr, wife of Ellis, testified: Prior to Adam's death family relations were good and cordial; all the families met at the homeplace Thanksgiving and Christmas; visits were frequent; Mrs. Furr always, prior to the family conference after Adam's death, gave presents to her grandchildren; the grandchildren would spend days in the home of the Furrs. After the "conference" relations changed completely; they were never thereafter invited to Mrs. Furr's home; she invited Mrs. Furr to visit her home, but Mrs. Furr refused to visit without Adele; while Mrs. Furr was in the hospital she tried to visit her but Adele pushed the door in her face; she tried again to visit Mrs. Furr but was denied entry by Adele. On another occasion she attempted to tell Mrs. Furr about a sick relative but Adele answered the phone and slammed the receiver down.

There was testimony by Ruth Furr, wife of Grover, that: Family relations were good until Adam's death, with frequent family visits; after the "conference" Mrs. Furr never visited her family at all; on one occasion she, her husband and children were moving some of their property from one of the Furr farms when Adele, in company with Mrs. Furr, drove up; Adele, in the presence of Mrs. Furr, threatened witness' son (Mrs. Furr's grandson) with a gun, said " * * * if we wanted him alive by sundown we better stop him"; following the "conference" her family was not permitted to see Mrs. Furr; Mrs. Furr never thereafter visited her grandchildren and ceased to send them Christmas presents.

The witness Rutledge testified: In the summer of 1962 he went to Mrs. Furr's home to secure a lease from Mrs. Furr and Adele; Mrs. Furr directed him to come back when Adele would be home; when he returned, Adele refused to sign; she said "she would sign no lease that Ellis Furr had ever signed"; in the presence of Mrs. Furr, witness was told by Adele that Ellis had once stolen some cows from her mother; all his conversation at that time was with Adele.

According to witness Mills he was, at Mrs. Furr's request, advising her in a business matter when Adele came in and made

the decision; Mrs. Furr quietly acquiesced. On another occasion Grover's family was visiting in witness' home when Mrs. Furr and Adele drove up; soon thereafter Adele came into the room and said to her mother, "Get your coat. We're going home. I don't like the company"; Mrs. Furr left without protest.

Witness Wright, long time friend of Adam and Fannie Furr, testified: Shortly after Adam's death he was present at the Furr home; Adele was leaving for Archer County; witness testified: "She told her mother she was going to Archer County to see about the cattle that she had up there and she asked Mrs. Furr—told her, she said, 'If Mr. Wright leaves before I get back, I wish you'd lock the doors in case Ellis and Grover comes up and don't appear. Don't let them in.' And whenever she did, why, Mrs. Furr said, 'Why?' And she said, 'Well, Mother, I'm afraid for you to let them in.' She said, 'I don't know what would happen to you if you let them in and nobody was here.' She said, 'They might just do anything to you to get their part of what you own too.'"

The witness also testified: In her mother's presence Adele stated she would not sign anything that would help her brothers; Mrs. Furr would not say anything after Adele spoke; witness knew of antagonistic feeling between Adele and her brothers and tried to patch things up; carried a proposal from the boys to Mrs. Furr; Mrs. Furr said the proposition sounded fair; that afternoon Adele was told about the offer, she would not go for it; she did not consult with Mrs. Furr; Mrs. Furr said nothing; after Adam's death, "Well, Mrs. Furr just seemed to be like she was cowed to say anything or do anything whenever Adele was around. * * * She didn't act like the same person." In Adele's presence Mrs. Furr would not talk about the estate or the boys; Adele "* * * would just try to tell her mother how much the boys hated her and what they would do to her and how they wanted to get their hands on her part of the estate and Mr. Furr's and

everything in general. That's the way she would just—she would just, you might say, be raving about the boys every time you'd go over there." He was asked, "What reference, if any, did she make as to her daughter, Miss Adele Furr, in living with her?" He answered, "Well, she said, 'I have to get along—' She said, 'Adele and I are living together and I've got to get along with Adele.'"

The witness Ling, who had done business with Adam for many years, testified: During the year 1961 he went to see Mrs. Furr about signing a lease; was told he would have to talk to Adele; Adele would not sign the lease; he paid Mrs. Furr several social visits and tried to pacify the family; during one visit Mrs. Furr said the boys were against her; she said further, "'Well, there's one thing I would like * * * If I could see my grandchildren and have it like it used to be * * * It's only natural that I long to have my grandchildren.'" Sometime later he met Mrs. Furr and Adele in an office building; he spoke to them, Mrs. Furr nodded but Adele ignored him; he again sought to obtain a lease from Mrs. Furr. "Q—Well, did you ask her (Adele) if her mother would sign the lease? A—Yes. Q—What did she say to that? A—I asked her if her mother was there and she said, 'Yes,' her mother was in the house. Q—Did you ask her if you could see her mother? A—Yes, sir, and she said, 'No.' Q—Did she say you could see her mother or not? A—No, I couldn't see her mother"; he was never able to talk to Mrs. Furr about the lease.

Louis Edward Furr, son of Grover Furr, testified: Shortly after Adam's death witness and his father attempted to move some cattle to a fresh pasture; after loading the cattle he was confronted by Adele and Mrs. Furr; Adele said, "* * * put the steers back, that she was going to run things just like PawPaw (Adam) had been running the operation and that if they didn't do what she wanted and what she said to do she would get rough and that we all knew how rough and mean she could be." He put

the steers back where they had been before he loaded them; witness went with his father and mother to the Sand farm to pick up some equipment which belonged to his father; when they started home Adele, Mrs. Furr and another couple were at the gate blocking the drive; Adele said she would not let them out; witness started the tractor, Adele then said to his parents, in Mrs. Furr's presence, " 'If you want that boy alive, you better stop him' "; on one occasion when Mrs. Furr was in the hospital witness visited her, "she seemed very receptive that we stopped by and visited with her. * * *"

Witness Isham worked on the Furr place after Adam's death; Adele told him she was boss over "the whole outfit"; he was to take his instructions from her; he heard Adele tell Mrs. Furr the boys "were too sorry to come on the place"; the statement was repeated several times; Adele told witness not to allow the boys on the place; " * * * not to let them come in at all"; he heard Adele tell some combine men "if they talked to Ellis and Grover she would run them off the place and fire them"; heard Adele tell Mrs. Furr the boys had cut one of her fences; he heard Adele tell Mrs. Furr that Ellis and Grover had put dirt in the gas tank of her tractor; he never did hear Mrs. Furr dispute a word Adele told her.

■ The issue of undue influence was strongly contested. The evidence introduced by appellant and her witnesses was such that it undoubtedly would have supported a verdict of no undue influence. The jury chose to believe, however, that undue influence was exercised over Mrs. Furr.

The evidence is ample to show, when believed by the jury, (1) the existence and exertion of an influence, and (2) the effective operation of such influence so as to subvert or overpower the mind of Mrs. Furr at the time of the execution of the instrument.

Whether the execution of the instrument would not have been performed but for such influence depends upon circumstantial evidence.

■ The establishment of the subversion or overpowering of the will of the testator is generally based upon an inquiry as to the testator's mental or physical incapacity to resist or the susceptibility of the testator's mind to the type and extent of the influence exerted. Words and acts of the testator may bear upon his mental state. Likewise, weakness of mind and body, whether produced by infirmity of age or by disease or otherwise, may be considered as a material circumstance in establishing this element of undue influence. The establishment of the fact that the testament executed would not have been executed but for such influence is generally predicated upon a consideration of whether the testament executed is unnatural in its terms of disposition of property. Long v. Long; Rothermel v. Duncan, supra.

The will in question was unnatural in that it bequeathed to Adele all the property. The evidence is undisputed that Mrs. Furr thought fondly of her five grandchildren until her death. Yet, her will provided that if Adele predeceased her the property would all go to two named charities. No provision whatever was made for her sons or grandchildren presently or for the future. The evidence is also undisputed that up to the death of Adam the "boys" meant as much to her as did Adele.

In Rothermel v. Duncan, 369 S.W.2d 917, the Supreme Court held: "In the absence of direct evidence all of the circumstances shown or established by the evidence should be considered; and even though none of the circumstances standing alone would be sufficient to show the elements of undue influence, if when considered together they produce a reasonable belief that an influence was exerted that subverted or overpowered the mind of the testator and resulted in the execution of the testament in controversy, the evidence is sufficient to sustain such conclusion."

In view of all the evidence in the record, the following statement from In Re Olsson's Estate, 344 S.W.2d 171 (El Paso Civ.App., 1961, ref. n. r. e.), is deemed particularly appropriate: "As was said in Curry v. Curry, 153 Tex. 421, 270 S.W.2d 208, 214, it (undue influence) may be exercised through threats or fraud or the silent power of a strong mind over a weak one.' It has also been held that it is immaterial when the influence was first brought to bear, if the effect of it continued until the time of the execution of the instrument, and procured its execution contrary to the maker's wishes. In such cases, it is held that the influence was exerted at the time of the making of the instrument. Kutchinsky v. Zillion, Tex.Civ.App., 183 S.W.2d 237 (wr. ref.) ; Cloudt v. Hutcherson, Tex.Civ.App., 175 S.W.2d 643 (wr. ref.). * * * She had become largely, if not wholly, dependent upon appellant for all of her needs. She was dominated by appellant in many of her activities and decisions. He controlled to some extent where she went, who she visited and who visited her, who she talked to, who she was permitted to be alone with and who she was not. He also determined when she should exercise, and for how long. The influence and dominance exercised by appellant over testatrix was acquired shortly after her stroke and was frequently asserted prior to the execution of the will in question. Whether such influence, as was shown to have been exercised over testatrix by appellant, was 'undue influence'; whether it was the result of the power of a strong mind over a weaker mind and body, or whether it resulted from fear, or for a desire for peace; and, whether the will itself was unnatural in its terms, were fact questions, all of which, we believe, were raised by the evidence, as well as the ultimate question of whether the disputed will was a product of such undue influence."

The jury could believe from the evidence that Adele completely dominated the mind and action of Mrs. Furr from Adam's death to Mrs. Furr's death.

From all the circumstances and evidence, the jury was entitled to believe that this influence existed at the time Mrs. Furr executed the will, and but for such influence Mrs. Furr would have executed a different will.

The jury did so believe. The evidence supports the finding and the finding is not against the great preponderance of the evidence.

Affirmed.