In re Estate of Flora Ann Pool OLSSON, Deceased.

No. 5441.

Court of Civil Appeals of Texas.

El Paso.

Feb. 15, 1961.

Rehearing Denied March 8, 1961.

Hardie, Grambling, Sims & Galatzan, El Paso, for appellant.

Scott, Hulse, Marshall & Feuille, J. F. Hulse, James S. Moore, El Paso, for appellee.

LANGDON, Chief Justice.

This is a will contest. Rudolph J. Olsson, appellant herein, sought probate of the will of his wife, Flora Ann Pool Olsson, deceased, dated November 8, 1956. Jessie Fay Webb, appellee herein and daughter of the deceased, sought probate of a prior will dated March 26, 1951, and opposed the probate of the later will on the grounds of testamentary incapacity to make such later will, and because of undue influence allegedly exerted upon the testatrix by the appellant. The case was tried to a jury, which found that said decedent testatrix was of sound mind when she made the later will, but that she was then unduly influenced by her husband to make such will. The trial court rendered judgment, based upon the jury findings, whereby the earlier will was admitted to probate, and the later will was denied probate.

Eight points of error have been assigned by appellant. The first six of such points (in various ways) raise the question of whether there was any evidence of probative value to sustain the trial court in vitiating the last will of the testatrix on the jury's finding of undue influence. The remaining two points (Points Seven and Eight), raise the question of the sufficiency of the evidence to sustain the jury's finding of undue influence. Since appellant has divided his points, and they fall naturally into two categories—those by which it is contended there was "no evidence", and those by which it is contended there was "insufficient evidence" to support the jury finding—we will discuss such points in the same manner.

▮ Appellant's "no evidence" points (Points One to Six), present a question of law. Our consideration of the points is limited to a determination of whether there was any evidence to raise the issue of undue influence and to support the jury's finding thereon. Montgomery Ward & Co. v. Scharrenbeck, 146 Tex. 153, 204 S.W.2d 508; Robertson v. Robertson, Tex.,

323 S.W.2d 938; Cartwright v. Canode, 1914, 106 Tex. 502, 171 S.W. 696.

In passing upon the law question of "no evidence", it is the duty of the courts to view the evidence in the light most favorable to the verdict, considering only that evidence which is favorable to or supports the verdict, and to disregard entirely all evidence which is contrary, adverse or conflicting to the favorable evidence. Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609.

▮ The cases dealing with the question of undue influence have generally recognized the difficulty, if not the absolute impossibility, of laying down a hard and fast rule or definition that would embrace all forms of undue influence. Consequently, there are numerous definitions of undue influence, and these " * * * are varied to meet the phase of the case then under consideration." Goodloe v. Goodloe, 47 Tex.Civ.App. 493, 105 S.W. 533, 535.

If a rule of general application exists at all with respect to undue influence cases, it is that *each case must stand on its own bottom as to the legal sufficiency of the facts proven.* Long v. Long, 133 Tex. 96, 125 S.W.2d 1034; Firestone v. Sims, Tex. Civ.App., 174 S.W.2d 279 (wr. ref.).

▮ Cases in which undue influence has been established by direct evidence are extremely rare. Such cases usually involve situations where the testator in a will, or the grantor in a deed, is shown to have been physically forced to do that which was against his will as the result of some direct or overt action whereby the will of another was substituted for that of the testator. It is, however, well settled that undue influence may be shown by circumstantial evidence as well as by direct testimony. 42 Tex.Jur. 795; Shofner v. Shofner, Tex.Civ.App., 105 S.W.2d 418 (wr. ref.).

The exercise of undue influence may be accomplished in many different ways—

directly and forcibly, as at the point of a gun; but also by fraud, deceit, artifice and indirection; by subtle and devious, but none-the-less forcible and effective means. More often than not, undue influence is impossible to establish by direct proof, and may only be shown by circumstances.

As was said in Curry v. Curry, 153 Tex. 421, 270 S.W.2d 208, 214, it "may be exercised through threats or fraud or the silent power of a strong mind over a weak one." It has also been held that it is immaterial when the influence was first brought to bear, if the effect of it continued until the time of the execution of the instrument, and procured its execution contrary to the maker's wishes. In such cases, it is held that the influence was exerted at the time of the making of the instrument. Kutchinsky v. Zillion, Tex.Civ.App., 183 S.W.2d 237 (wr. ref.); Cloudt v. Hutcherson, Tex.Civ.App., 175 S.W.2d 643 (wr. ref.).

Where circumstantial evidence is relied upon to show undue influence, as in the case now before us, the circumstances must be of a reasonably satisfactory and convincing character. Helsley v. Moss, 52 Tex.Civ.App. 57, 113 S.W. 599 (wr. ref.).

Applying the general rules and principles announced above, we must determine what facts and circumstances in this record are admissible and constitute evidence of probative force on the issue of undue influence. Generally, the circumstances which are material and should be considered in determining the existence of undue influence are: (1), the surroundings and circumstances attending the execution of the instrument, including the relationship between the maker of the instrument and the beneficiary and any others who might be expected to be recipients of his bounty; (2), the motive, character and conduct of the persons benefited by the instrument; (3), the participation by the beneficiary in the preparation or the execution of the instrument; (4), the words and acts of the parties; (5), the interest in and the opportunity for the exertion of undue influence; (6), the physical and mental condition of the maker of the instrument at the time of its execution, including his age, any weakness or infirmity, and the extent to which he was dependent upon and subject to the control of the beneficiary; and (7), the improvidence of the transaction by reason of unjust, unreasonable or unnatural disposition of the property.

All material facts and circumstances shown by the evidence should be considered; and, if such facts and circumstances when considered together, produce in the ordinary mind a reasonable belief that undue influence was exerted in procuring the instrument, they are sufficient to sustain an affirmative finding on the question. Mayes v. Mayes, Tex.Civ.App., 159 S.W. 919, at page 922.

It is the contention of appellant that the record in this case is totally bare of facts which would justify the rejection of the 1956 will as a product of undue influence exercised over the mind of the testatrix by Rudolph J. Olsson. Since the jury found, however, that undue influence was exercised, we must therefore indulge the presumption that the jury believed and accepted all probative evidence tending to sustain its verdict.

The record before us shows that appellant was born August 8, 1907; consequently he would have been 45 years of age when he came to El Paso and married the testatrix, who was, at that time, 70 years of age. He had been married twice prior to his marriage to testatrix and was still married to his second wife when he began a correspondence and a courtship with the testatrix. Two children were born of appellant's second marriage, one of whom was living with appellant and the other with appellant's wife in Virginia. This marriage was dissolved by a Virginia divorce decree on November 4, 1952, and one month later,

on December 4, 1952, appellant married the testatrix. At the time of his marriage to testatrix, appellant was unemployed, although he had previously worked as a cook in a cafe in the small town of Hubbard, Texas. He quit working prior to his marriage to testatrix because of stomach trouble and, so far as the record in this case reflects, he was thereafter at all times unemployed. He owned no property, and his only source of income was a monthly compensation check from the government amounting to just over $150.

Appellant was introduced to the testatrix by a Mrs. Kramer, who operated a rest home in El Paso. Prior to the introduction, she had placed appellant and the testatrix in correspondence with each other through the medium of what one witness referred to as a "lonely hearts" type of correspondence. While the record does not reflect the size of the estate left by testatrix, it does reflect that she owned a home in El Paso, a half interest in a cafe and residence in Ruidoso, New Mexico, an irrigated farm, government bonds, a bank account, and other properties, at the time of her marriage to appellant, and it may be assumed that she was at least modestly well-to-do. Appellant made a trip from Hubbard to El Paso in late 1951 or early 1952, after having previously corresponded with, but before ever meeting, the testatrix. It was on this trip that he was introduced to testatrix by Mrs. Kramer. Thereafter, he made at least two more trips to El Paso for the purpose of seeing the testatrix before they were married on December 4, 1952.

Before her marriage to appellant, testatrix—Flora Ann Pool Olsson—had lived on a farm in the El Paso area with her husband, James H. Pool, who died in 1947. When she married appellant in 1952, her family consisted of a married daughter, Jessie Fay Webb (appellee), and an invalid son, James S. Pool, who died in 1955, and two grandchildren, James K. Webb and Jesse Pool Webb. She had executed a will on March 26, 1951, in which she left her entire estate to her daughter, Mrs. Webb, subject to a trust providing for the support and maintenance of her invalid son, with her two grandsons being named as contingent beneficiaries. It was this 1951 will that was admitted to probate in both the County and District courts of El Paso County, Texas.

Testatrix was in good health at the time of her marriage to appellant; but, on December 22, 1954, two years after her marriage, she suffered a severe stroke which left her critically ill for an extended period of time, and thereafter paralyzed on the left side. During the balance of her life, she was never able to walk without assistance, and even then for only short distances. When not confined to a sick-bed, she spent her time in a wheel chair. She was unable to care for herself, required assistance in the bathroom, and became wholly dependent upon appellant, or others, for physical movement in or outside the house. From the time of the stroke until April, 1957, she required nursing care, either around the clock or part time, and was thereafter dependent upon the appellant, Mr. Olsson. She needed help to get in or out of her sick-bed or wheel chair. Her memory and powers of concentration became impaired; she developed an impediment in her speech; her eyesight became poor; she often failed to recognize friends of long standing; she inquired about friends and acquaintances long dead, as if she believed them to be still living; she had difficulty carrying on a connected conversation; she seem childish at times and cried frequently; and her handwriting, spelling and punctuation (which had previously been good) became very poor.

The record before us reflects that appellant was never employed at any time during his marriage to testatrix, and that, aside from the check he received from the government each month, he had no other income and possessed no property of his own. From these circumstances, the jury may have inferred that appellant had a motive,

as well as some interest, in succeeding to the property of the testatrix. Some of the financial transactions involving money and property belonging to the testatrix which took place during the marriage are detailed from the record.

On January 14, 1953, less than six weeks after their marriage, appellant accompanied the testatrix to the State National Bank, where she changed her personal account in said bank to a joint account with appellant in her new married name. Less than four months later, on May 6, 1953, testatrix returned to the bank without the appellant, her husband, and gave instructions to the bank to close the joint account and to re-open the account in her name only. Testatrix gave no reason for closing the joint account. She suffered her stroke on December 22, 1954 and was thereafter in a wheel chair, accompanied by her husband, or by her husband and a nurse, whenever she left her house. The record reflects that appellant purchased one or more automobiles without previously consulting the testatrix. In 1955, after learning that the witness, Mrs. Sublette, a nurse for testatrix at the time, was a notary public, appellant had testatrix sign some United States bonds. He and the nurse propped her up in her bed, and partially holding her with a board across to steady her, the testatrix attempted to sign the first bond. The testimony of the witness, Sublette, concerning the attempted execution of the first bond is set out below:

"Q. Was she in bed. or up in a chair?

"A. She was in bed, on the side of the bed, we were just holding her practically, and poor thing, she just went all to pieces. She seemed to sign the first one wrong, she did not sign the Pool part of it, as well as I remember, she did not put the signature he wanted, and he went all to pieces, and of course, the more he scolded the worse she cried, so we just had to stop. Later on he had her practice her signature, and

I don't know what he did about that bond."

According to the witness, the bonds were issued in the name of Mr. and Mrs. Pool (James Pool, former husband of testatrix died in 1947). The testatrix was unable to sign any bonds the first day. Mrs. Sublette testified, " * * * she got that one wrong and we had to quit, she went almost into hysterics * * *" Thereafter, appellant had the testatrix practice her signature whenever she sat up for anything, or at meal-time. Over the course of the next three or four days, testatrix endorsed a few of the bonds at a time and, finally, all of the bonds, estimated by Mrs. Sublette to be worth about $7,000.00, were signed by testatrix and notarized by Mrs. Sublette.

The testatrix owned a half interest, with her daughter, Mrs. Webb, in a cafe and residence at Ruidoso, New Mexico. According to the witness Sublette, appellant negotiated and arranged for the sale of this property to a woman in Ruidoso, without previously discussing the matter with testatrix. A portion of the testimony is set out:

"Q. What did Mr. Olsson say, either to you, or that you heard him say?

"A. Next day I heard him, they were arguing, Mrs. Olsson was wanting to know what he had done. It seems she did not know that he had put the place up for sale in Ruidoso."

The testimony of the witness was to the effect that Mrs. Olsson did not want to sell the property and did not believe they were getting enough money for it; and, also, that Mrs. Olsson questioned appellant as to what on earth was happening to all of the money, and he replied that it was going for her care. The record reflects that the property in Ruidoso was sold, and that the interests of the Webbs was accounted for.

Other transactions involved a series of loans obtained by the testatrix on her farm in New Mexico. Two loans were for $5,-000.00 each, the first of which was obtained

through a New Mexico bank in the summer of 1956; the second loan through the same bank in February 1957, also for $5,000.00; and a third loan for $20,000.00 obtained through the Federal Land Bank. The proceeds of the last loan were used to pay off a balance of $9,500.00 owed the bank on the first two loans, and the remainder—$10,500.00—was paid to the testatrix. In making the latter loan, all discussions with the lender and all correspondence concerning the same were addressed to Mr. Olsson, alone.

It is appellant's contention that there is no evidence whatsoever to show that Mrs. Olsson was under Mr. Olsson's influence at the very time the will was executed, and that the circumstances are insufficient to raise the issue of undue influence. Appellee, on the other hand, contends that the evidence shows that appellant had a "yen" for his wife's property from the time he married her; that he was an adventurer, who married his wife for her property, and that he succeeded in spending a considerable amount of her money, and helped to convert into expendable cash some of her assets, and that he had both the motive and the opportunity to influence her to make a will in his favor. That he fostered his wife's complaint that her family did not come to see her often enough, and encouraged the belief that his wife's daughter and her two grandchildren cared nothing for her, all for the ulterior purpose of alienating her affection from her daughter and grandsons, and that appellant was discourteous to the Webb family and Mrs. Olsson's old friends for the deliberate purpose of making his wife more dependent upon him, thus bringing his wife more and more within his sole control and sphere of influence, through which he was able to procure his wife to make a new will, leaving all of her property to appellant and naming appellant's son, a child who had spat at her and been disrespectful to her, as a contingent beneficiary.

The record in this case reflects that, before her marriage to appellant, testatrix had a wide acquaintance and many friends in the area; that her friends were always welcome in her home, and that a close family relationship existed between the testatrix and her daughter and two grandsons, and that they visited each other frequently. After the marriage, appellant's attitude toward the family of testatrix was critical, and he never encouraged friends of the testatrix to visit her. His conduct toward those who visited the testatrix was described by various witnesses as "most uncordial", "not courteous", as not caring "whether I came or not", and as "discourteous." One of the witnesses, a nurse, testified that she was instructed by appellant "never to leave her (Mrs. Olsson) alone with the family, not one minute, not even to go to the kitchen to get a drink of water." Another nurse, testifying as a witness, said that appellant told her "not to ever let anybody be in there talking to her without him being there too." The testatrix told her grandson, James Webb, that she wanted to come to see the family more often, but that Mr. Olsson wouldn't bring her. When Mr. Webb (appellee's husband) offered to come and get her whenever she wanted to visit the family, "she said no, that would make Rudy (Mr. Olsson) mad." Other witnesses testified that Mrs. Olsson was "easily swayed"; that she always obeyed her husband, and if there was a disagreement, appellant succeeded in getting his own way. One witness described appellant's attitude toward his wife as being "nauseatingly loving at times and at other times drastically frightening;" that, at times, appellant used vulgar and profane language toward testatrix; that he acted mean and would become mad at her.

A Mrs. Marie Elliott, a long-time friend of testatrix, testified that she and Mrs. Webb visited testatrix on one occasion during the summer of 1955. Appellant was not at home when they arrived, but Mrs. Olsson was there, attended by a nurse who was pushing her about the premises in a wheel chair. Mrs. Olsson was enjoying her visitors, laughing and occasionally en-

tering into the conversation with a word or two. Appellant returned home with a load of groceries soon after their arrival. He went on into the house and in a few minutes came out; he did not speak to either Mrs. Webb or to the witness, Mrs. Elliott, but told the nurse to "come on." He commenced pushing the wheel chair up the ramp and into the house. Mrs. Olsson was crying and appeared to be terrified. When the witness and Mrs. Webb entered the house some five or six minutes later, appellant was fitting a brace on Mrs. Olsson's left leg. He then placed her on her feet alongside a four-foot high rod, or railing, which she was supposed to hold on to with her right hand to help her walk. "She was crying terribly." "All the time they were walking, she asked if she could not sit down, but she could not sit down because the wheel chair had been pushed away so that she could not get to it."

"Q. Was she permitted to sit down?

"A. No.

"Q. How far did she walk?

"A. Well she walked up and down that rail, I don't know how many times, but I suppose we went in around four-thirty or sometime around there, and the nurse left at five o'clock and she was still walking at that time."

Five witnesses testified that testatrix was afraid of appellant. Mrs. Sublette testified that Mrs. Olsson had warned her, "don't make him (appellant) mad."

On October 29, 1956, appellant and a nurse took Mrs. Olsson to a lawyer's office. Following a half hour conference, during which time appellant was alone with her lawyer, a will was drawn. When Mrs. Olsson left the lawyer's office that day, she left with appellant and the nurse. Ten days later, on November 8, 1956, the will was signed by the testatrix in the offices of Dr. Jack Postlewaite. She was accompanied to the doctor's offices by appellant, and he waited for her in the doctor's recep-

tion room while the will was being signed by the testatrix in another room. When testatrix left the doctor's office after signing the will, she left with appellant. On both occasions—at the lawyer's office and at the doctor's office—she was in a wheel chair and dependent upon appellant or another for physical movement. Testatrix died, at the age of 75 years, on July 1, 1958, one year and eight months after executing the will in Dr. Postlewaite's office. Surviving her were her husband, Rudolph J. Olsson, her daughter, Jessie Fay Webb, and her two grandsons, James and Pool Webb.

The evidence in this case also shows that, both before and after the execution of the will on November 8, 1956, the testatrix had stated that she wanted the farm to go to her daughter, and ultimately to her two grandsons. A month before she died, she asked her grandson, James Webb, if he thought he or his brother could run the farm.

■ While there is no direct evidence to show that appellant exerted undue influence on the testatrix at the very moment the will was signed, we are of the opinion that the circumstances in evidence are sufficient to raise more than a mere suspicion of the exercise of undue influence. We accordingly overrule appellant's points based on the contention that there was no evidence to raise the issue of undue influence and to support the jury verdict thereon.

Appellant's remaining two points attack the sufficiency of the evidence. In considering these points, we have again carefully combed the record and have reviewed all the evidence, that which supports the verdict as well as that which does not. The circumstances surrounding the preparation of the will, including the instructions given by testatrix to her attorney, and the circumstances attending the execution of the will some ten days later, are important circumstances bearing on both the issue of undue influence and the issue of the testamentary capacity of the testatrix. On the issue of undue influence, the cir-

cumstances are that appellant was not physically present when testatrix instructed her attorney regarding the contents of the will, nor was he physically present when she signed it. On each occasion, however, appellant is shown to have accompanied testatrix when she went to her lawyer's office to discuss the terms of her will, and when she went to her doctor's office to sign it; he waited for her in one room while she was in another; when she came out each time he was there, and he left with the testatrix on each of these occasions.

■ Such evidence does not preclude a jury finding that undue influence was exerted at the very time of the making of the instrument, for it has been held that it is immaterial when the influence was first brought to bear, if the effect of it continued until the time of the execution of the instrument, and procured its execution contrary to the maker's wishes. In such cases, it is held that the influence was exerted at the time of the making of the instrument. Kutchinsky v. Zillion; Curry v. Curry; and Cloudt v. Hutcherson, supra.

■ We, of course, recognize the rule that a person of sound mind has a perfect right to dispose of his property as he wishes. In the case at hand, the jury found that testatrix was of sound mind. Had the jury found that testatrix was entirely lacking in mental or testamentary capacity, such finding would have precluded the existence of undue influence; but a weakened mind, short of mental incapacity, may be a material consideration in determining the existence of undue influence.

At the time of the execution of the will in question, testatrix was 74 years of age; her health had been impaired by a stroke which left her partially paralyzed, unable to walk, and weak in both mind and body. She had become largely, if not wholly, dependent upon appellant for all of her needs. She was dominated by appellant in many of her activities and decisions. He controlled to some extent where she went, who she visited and who visited her, who she talked to, who she was permitted to be alone with and who she was not. He also determined when she should exercise, and for how long. The influence and dominance exercised by appellant over testatrix was acquired shortly after her stroke and was frequently asserted prior to the execution of the will in question. Whether such influence, as was shown to have been exercised over testatrix by appellant, was "undue influence"; whether it was the result of the power of a strong mind over a weaker mind and body, or whether it resulted from fear, or for a desire for peace; and, whether the will itself was unnatural in its terms, were fact questions, all of which, we believe, were raised by the evidence, as well as the ultimate question of whether the disputed will was a product of such undue influence.

■ Considering all the evidence, we believe the evidence which supports the verdict preponderates over that which does not; and, since in our opinion the verdict of the jury is neither manifestly unjust nor clearly wrong, appellant's points Seven and Eight are accordingly overruled.

Finding no error, the judgment of the trial court is affirmed.