

**NUMBER 13-09-259-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**RENE PERALEZ,**                                                                 **Appellant,**

**v.**

**NOE PERALEZ, ET AL.,**

                                                                                              **Appellees.**

### On appeal from the Probate Court
### of Hidalgo County, Texas.

# MEMORANDUM OPINION

**Before Justices Rodriguez, Benavides, and Vela**
**Memorandum Opinion by Justice Vela**

This is an appeal from a jury award in a will contest and fraud case. Appellees, Noe

Peralez, Carlos Peralez, Jr. ("Charlie"), and Joel Peralez ("the brothers"), filed suit against

their youngest brother, Rene Peralez, claiming that Rene unduly influenced his father,

Carlos Peralez, Sr., to prepare a will that left the bulk of his estate to Rene.[1]  The brothers

also filed an action for fraud against Rene, pleading that Rene told them if they did not

contest probating the will, he would divide the estate equally among the four of them.  They

claim that, by reneging on this promise, he defrauded them.  The jury found that Rene had

unduly influenced his father and that Rene had defrauded his brothers.  The trial court set

aside the will, which had been previously admitted to probate, and awarded each of the

brothers $100,000 for pecuniary loss caused by the fraud, $40,000 for "actual

consequential loss sustained in the past," $25,000 for "actual emotional distress sustained

in the past," and $75,000 in exemplary damages.  On appeal, Rene challenges the legal

sufficiency of the jury's findings of undue influence and fraud, and the amounts and

evidentiary support for the consequential and emotional distress damage awards.  He also

claims lack of subject matter jurisdiction with respect to the fraud claim because its

disposition was not related to the administration of the estate.  We affirm, in part, and

reverse and render, in part.

## I. PROCEDURAL BACKGROUND

Carlos Peralez, Sr., the testator, died of cancer on March 18, 2006.  He left a will

that he had executed on March 7, 2006, less than two weeks before his death, giving the

majority of his $391,354.45 estate to Rene, with the exception of a house, which he

devised to Rene's daughter, Sandy.  He had no prior will.  In the will, Carlos provided that

each of his sons would receive certain EE United States Savings bonds that he had

purchased for them throughout the years. The number of bonds Carlos purchased and the

---

[1]The appellees also filed suit against Sylvia Peralez, Rene's wife, and Sandy Peralez-Escamilla, Rene's daughter.  All claims were disposed of prior to jury submission and are not the subject of this appeal.

2

values of the bonds were not equal. For instance, he purchased 121 bonds for Rene, worth $53,000, and only one for his son, Noe, worth $15,216. Although these were not probate assets, Richard Talbert, Carlos's attorney, testified that he put them in the will at Carlos's request as a way of letting his other sons know that they had not been forgotten. The will stated that Carlos was fully mindful of the fact that he had three additional sons and the disposition of his estate was not reflective of the love he had for each of his sons.

The evidence at trial showed that Rene had left his employment and was attempting day trading. The other three sons were gainfully employed. Rene and his family had always lived close to Carlos, while the other sons lived farther away. There was testimony that each of the four sons was close to his father and conflicting testimony that some of the four sons had problems with their father over various matters throughout the years. The evidence was undisputed that Carlos was a strong-willed and private man.

The brothers first read the will on March 24, 2006, and were suspicious. Rene filed the application to probate the will and request for letters testamentary on April 26, 2006. The estate was administered by April 17, 2007. He did not inform his brothers until after he had probated the will. The brothers filed their will contest on June 27, 2007. After a two week trial on the merits, the trial court entered judgment in accordance with the jury's determination that Rene had unduly influenced his father and had defrauded his brothers.

## II. UNDUE INFLUENCE

### A. Trial Testimony

The evidence offered at trial was conflicting and contentious. The brothers urged that Rene poisoned their father against them through lies and manipulation, inducing

3

Carlos, who was in a weakened condition, to leave everything to him. Rene argued that he was closest to his father throughout his life, he cared for his father during his last illness, and his father's will reflected this close relationship.

### 1. Execution of the Will

The following facts regarding the actual execution of the will are undisputed as Richard Talbert, Carlos's attorney, was alone with Carlos when the initial discussion about the disposition occurred. Carlos paid two visits to Talbert shortly before his death. During the first appointment, on February 27, 2006, Carlos told Talbert that he wanted to write a will "to get his affairs in order." Talbert said that Carlos informed him that his illness was terminal. Talbert testified that Carlos told him that he wanted the house on Georgia Street to go to his granddaughter and the rest of his assets to go to his son, Rene. His granddaughter was already living in the house. According to Talbert, Carlos knew what he wanted. Talbert had no concerns about Carlos's judgment. Talbert said that Carlos told him that there had been different relationships with his sons since his divorce from his sons' mother and that some of his sons had been at his house going through his documents. Talbert testified that he saw nothing to indicate that Carlos was unable to make an intelligent decision concerning his will.

On March 7, 2006, Carlos went to Talbert's office to execute his will. At this visit, Carlos was accompanied by Alonzo Peralez, his brother. The will was executed without changes. Talbert noted that Carlos seemed weaker physically than he was the week before, but Talbert opined that Carlos was in full control of his mental faculties. Talbert testified that neither Rene nor his wife had ever contacted him prior to the execution of the will. He saw no undue influences upon Carlos. Carlos's reputation in the community was

4

as a strong-willed individual. That is the person Talbert saw in his office the day the will was executed. Lupita Talbert, a witness to the will as well as Talbert's wife and office manager, testified that when she saw Carlos at the office on February 27th, he was able to converse and was walking without assistance. He told her he needed to get his affairs in order because "some of his sons were asking about this and that."

There was no direct testimony or circumstantial evidence suggesting that Rene was there when the will was executed. There was also no direct evidence that Rene had anything to do with the preparation of the will, including choosing Talbert as an attorney. Talbert had represented Carlos in the past in real estate matters. There was evidence that at the time Carlos executed the will he was in a weakened state and was on pain medication, and there were suggestions that it would have been difficult for Carlos to have driven himself to Talbert's office in the condition he was in. There was no direct evidence that Rene actually participated in taking Carlos to Talbert's office.

### 2. Relationships with the sons

The contestant sons were surprised at Carlos's disposition. There was testimony that each of the three contestants had a strong and close relationship with Carlos. Charlie was the oldest. He is a refrigerator mechanic, working for an appliance company in McAllen. He did not testify at trial. Noe Peralez, the second-oldest, is successfully employed by a school district. Joel, the third oldest, is an attorney.

Noe testified that he had a good relationship with his father and continued to see him after his parents divorced. According to Noe, Carlos treated all of his children and grandchildren the same. Noe stated that he had stayed with his father when his father had knee surgery and had lunch with his father once or twice a week. Carlos often came to

5

Noe's house. The entire family celebrated holidays and important events together. Noe introduced evidence showing how close Carlos was to his family, including family photographs and oral testimony recounting the times Carlos spent with Noe's family.

Noe testified that his father became weaker and weaker as he neared death and that Carlos was cranky, depressed, and on pain medication. Noe said that his father had a bad temper and could be vindictive. He believed that his father was vulnerable to having the relationship between Carlos and the brothers poisoned by Rene. Noe heard that Carlos believed that the sons were snooping around his property. Noe denied that this was true. Rather, Noe believed that Carlos had been told this by Rene because Rene wanted to hurt Carlos's relationship with his other sons.

Noe also testified regarding Rene's propensity for lying. For instance, he recounted an incident in which Rene had lied under oath that Carlos had filled out some checks for bills a few days before his death. In fact, Carlos had signed the checks, but Rene and his daughter had completed the checks. Noe also testified that Rene lied to him by telling him that he didn't know whether Carlos had a will, when, in fact, Carlos gave Rene a copy of the will before he died.

Joel testified that his father told him he was proud of him. When his father became ill, Joel suggested chelation therapy to his father and offered to pay for it. He also said that when Rene told him that Carlos was worried about his funeral expenses, Joel paid for the funeral. His father never thanked him, which Joel found suspicious. Joel believed that Rene never told Carlos that Joel had paid for the funeral. According to Joel, Rene would "shadow" him during his visits to Carlos. Joel discussed an incident in which he took soup to his father and was turned away by Rene who told him that the refrigerator wasn't

6

working. At that time, Rene had moved in to help his father because he was on hospice care and could not be alone. In fact, Rene was not telling the truth about the refrigerator not working. Joel also thought it was suspicious that Rene had been staying with his father for three days, but left to do some work at his own home on the precise day and time his father went to Talbert's office to discuss the will. In Joel's opinion, Rene left so that it would appear he did not have anything to do with the will.

Rene testified that Carlos was his best friend in life. He said that two of his brothers were at the Golden Gloves tournament a few weeks before his father's death. The brothers denied this. He said his brother Charlie only came to see his father three times from his diagnosis until his death. Rene moved into his father's home on March 3, and remained there until Carlos died. Rene introduced evidence of several bank accounts Carlos had opened from 1996 through 2003, naming Rene as the beneficiary of payable on death accounts. For instance, Carlos opened an account with City National Bank on April 25, 2003, payable on death to Rene Peralez. He named Sandy Escamilla, his granddaughter, as a person who would always know his location. Carlos named Rene Peralez as the beneficiary of his account with Elsa State Bank when he opened the account on October 1, 2002. Rene was also named as a co-owner of several certificates of deposit that he testified he was unaware of prior to his father's death. Rene was also the beneficiary of his father's teacher retirement account at the time his father retired from the school district, entitling Rene to more than $900 per month upon Carlos's death.

Rene testified that he didn't shadow his brothers, there was no conspiracy between he and his wife and daughter to unduly influence Carlos, and he simply misspoke when he testified that his father had completed the entire check when the final bills were paid, when,

7

in fact, Carlos had only signed them.

Beatriz Peralez, Carlos's ex-wife and the mother of the four brothers, testified that contrary to Rene's testimony, there were not "two camps." Rene had previously testified that he and his father constituted one camp and his mother and the three will contestants were the other. She said that Rene had once told her that he wished his father would die so he wouldn't have to put up with him. She stated that Rene had lied about his brothers' reactions to their father's death. Rene had testified that the brothers were laughing after their father had died. Carlos's brother also testified that the brothers were "giggling and laughing" after his death.

Scott Henderson, the hospice nurse, testified that Carlos was a very private individual. Henderson stated Rene was at his father's house for the initial admission to hospice. Carlos did not begin using morphine until the very end of his life. He wanted to be in control. Henderson said that Carlos wanted to be in control until the very end and did not ever appear to be controlled by Rene. Carlos's condition declined rapidly during the last three days of his life. According to Henderson, Rene took exemplary care of Carlos.

## B.  The Law–Undue Influence

A person of sound mind has the right to dispose of his property in the manner he or she wishes. *Rothermel v. Duncan,* 369 S.W.2d 917, 923 (Tex. 1963). In order to establish undue influence, a party has the burden to show:  (1) the existence and exertion of influence; (2) the effective operation of an influence so as to subvert the will or overpower the mind of the grantor at the time of the execution; and (3) the execution of an instrument the maker would not have executed but for such influence. *Id.* at 922. The elements of

undue influence may be proven by circumstantial, as well as direct, evidence. *Id*. However, "the exertion of undue influence cannot be inferred by opportunity alone." *Cotten v. Cotten*, 169 S.W.3d 824, 827 (Tex. App.–Dallas 2005, pet. denied). There must be some evidence to show that the influence was not only present, but was, in fact, exerted with respect to the making of the instrument. *Id*. Mere requests or entreaties to execute a favorable instrument are not sufficient to establish subversion or overpowering of the maker's will, unless the entreaties are shown to be so excessive as to subvert the will of the maker. *Curry v*. *Curry*, 270 S.W.2d 208, 212 (Tex. 1954).

The exercise of undue influence may be by fraud, deceit, artifice and indirection. *In re Estate of Olsson*, 344 S.W.2d 171, 173-74 (Tex. Civ. App.–El Paso 1961, writ ref'd n.r.e.). "More often than not, undue influence is impossible to establish by direct proof, and may only be shown by circumstances." *Id.* at 174. In *Olsson*, there was no direct evidence that the appellant was physically present when the testatrix signed the will. *Id*. at 178. However, the court found that it did not preclude a jury finding that undue influence was exerted at the time of making the will because the effect of the influence continued until the time of the execution of the instrument. *Id.* at 179. In determining the existence of undue influence, it is proper to consider all evidence of relevant matters that occurred within a reasonable time before or after the will's execution. *Watson v. Dingler*, 831 S.W.2d 834, 837 (Tex. App.–Houston [14th Dist.] 1992, writ denied)

Factors to be considered in determining the existence of undue influence include the following: (1) the nature and type of relationship existing between the testator, the contestants, and the party accused of exerting such influence; (2) the opportunities existing

9

for the exertion of the type or deception possessed or employed; (3) the circumstances surrounding the drafting and execution of the testament; (4) the existence of a fraudulent motive; (5) whether there had been a habitual subjection of the testator to the control of another; (6) the state of the testator's mind at the time of the execution of the testament; (7) the testator's mental or physical incapacity to resist or the susceptibility of the testator's mind to the type and extent of the influence exerted; (8) words and acts of the testator; (9) weakness of mind and body of the testator, whether produced by infirmities of age or by disease or otherwise; and (10) whether the testament executed is unnatural in its terms of disposition of property. *In re Estate of Graham,* 69 S.W.3d 598, 609-10 (Tex. App.–Corpus Christi 2001, no pet.).

When circumstantial evidence is relied upon, the circumstances must be so strong and convincing and of such probative force that would lead a well-guarded mind to a reasonable conclusion not only that undue influence was exercised but that it controlled the will power of the testator at the precise time the will was executed. *Green v. Earnest*, 840 S.W.2d 119, 121 (Tex. App.–El Paso 1992, writ denied); *see also In re Estate of Longuet*, Nos. 13-99-549-CV, 13-99-637-CV, 2000 WL 35729674, at *3 (Tex. App.–Corpus Christi, Dec. 21, 2000, pet. denied) (not designated for publication). Circumstances relied upon to establish the elements of undue influence must be reasonably satisfactory and convincing in character, and they must not be equally consistent with the absence of the exercise of such influence*. In re Estate of Steed,* 152 S.W.3d 797, 810 (Tex. App.–Texarkana 2004, pet. denied).

## C. Analysis

When reviewing the evidence, this Court may not substitute its judgment for that of the jury even if it disagrees with the outcome. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). When enough evidence is before the fact finder that reasonable minds could differ on the meaning of the evidence or the conclusions or inferences to be drawn from that evidence, the court may not substitute its judgment for that of the jury. *Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex. 1988).

There was evidence that Carlos was in a weakened condition and in pain at the end of his life. He was on medication and was relying on Rene to assist him with his basic needs. There was evidence that Rene had the opportunity to unduly influence Carlos as he was acting as his care giver during the final days of Carlos's life. There was also more than a scintilla of evidence of motive. Rene had given up his job, either to retire or for some other reason. He was dipping into his 401k account to live. There was evidence that his wife was also not employed. And, there was evidence that someone was telling Carlos that the brothers were snooping around and looking into his affairs. The brothers denied snooping and Rene emphatically denied telling his father that his brothers were looking into Carlos's property. But the jury believed the brothers' testimony over Rene's. The jury could have inferred deceit and an attempt on Rene's part to influence Carlos. There was also some testimony that Rene kept the brothers from seeing their father at the end of his life and that Rene would "shadow" them when they visited. The jury could have inferred from this testimony that Rene was attempting to unduly influence his father to leave everything to Rene. There was also evidence that Carlos was going to divide his property equally when he passed away. In sum, the jury could infer from this testimony, when combined with

11

testimony that Carlos had always treated the four sons and their families equally, that there existed circumstances of undue influence. The jury determined that Rene had the motive, opportunity and, in fact, did unduly influence his father to leave Rene the bulk of his estate. The evidence presented was more than a scintilla of evidence suggesting undue influence. We will not substitute our judgment for that of the jury. We overrule issue one.

### III. FRAUD

**A. Jurisdiction**

By issue two, Rene complains that the statutory probate court lacked jurisdiction over his brothers' fraud claim because its disposition was not related to the administration of the estate. Rene argues that the fraud claim against him in his individual capacity is not a matter appertaining to or incident to the estate. The claim was that Rene committed fraud by telling Noe that he would divide the estate equally among the four brothers if they would not file a will contest. When the brothers realized that he was not going to divide the estate as he had promised, the brothers did contest the will. By the time they filed the will contest, however, there was testimony that Rene had disposed of many of the estate assets, including Carlos's house. The brothers claim that Rene sold the home for far less than it was worth.

"After a will has been admitted to probate, any interested person may institute suit in the proper court to contest the validity thereof, within two years after such will shall have been admitted to probate . . . ." TEX. PROB. CODE ANN. § 93 (Vernon 2003). At the period of time applicable here, the probate code provided that a statutory probate court had jurisdiction over any matter appertaining to an estate or incident to an estate and could

12

exercise pendent and ancillary jurisdiction necessary to promote judicial efficiency and economy. Tᴇx. Pʀᴏʙ. Cᴏᴅᴇ Aɴɴ. § 5(h), (i) (repealed by Acts 2009, 81st Leg. Ch.1351, § 12(h)). In proceedings in constitutional county courts and statutory county courts at law, "the phrases 'appertaining to estates' and 'incident to an estate' in this Code include the probate of wills . . . and also include, but are not limited to, all claims by or against an estate, . . . and generally all matters relating to the settlement, partition, and distribution of the estates of deceased persons." Tᴇx. Pʀᴏʙ Cᴏᴅᴇ Aɴɴ. § 5A(a) (repealed by Acts 2009, 81st Leg., ch 1351, §12(h), eff. Sept.1, 2009).

Here, the parties filed a will contest in the statutory probate court. As part of their claim, they sought to hold Rene, who was executor of the estate, liable for fraud involving statements made concerning how the assets would be distributed if the will was not contested. Pursuant to section 5(i), the court could exercise jurisdiction over ancillary matters to promote judicial efficiency and economy. Since all of the brothers' claims dealt with Rene's handling of the estate, the trial court did not err in hearing the fraud issue in the interest of judicial efficiency and economy. We overrule issue two.

**B. Evidentiary Issues**

By issues three through five, Rene complains that there was no evidence of fraud in the inducement because the brothers chose to rescind any alleged contract when they filed a will contest; there was no evidence offered of an enforceable contract or justifiable reliance; and there was no evidence to support the award of damages.

Rene first complains that the brothers are not entitled to have the will set aside and recover damages for fraud because they chose not to stand on their contract, but instead electing to contest the will. The jury found two different claims of wrongful conduct—unduly

13

influencing Carlos to write a will leaving everything to Rene, and committing fraud against the brothers by failing to distribute the estate equally after agreeing to do so. The purpose of the doctrine of election of remedies is to prevent double recovery for a single wrong. *Vickery v. Vickery*, 999 S.W.2d 342, 373 (Tex. 1999); *Weeks Marine*, *Inc. v. Salinas*, 225 S.W.3d 311, 322 (Tex. App.–San Antonio 2007, pet. dism'd). Here, the trial court set aside the will and awarded the brothers the equivalent of their equal share of the estate. There was more than one wrongful act that gave rise to different sets of damages. The brothers' fraud claim would allow them to recover both actual, exemplary and consequential damages if the evidence supported those damages, and the setting aside of the will brought the parties back to the position they would have been in had no undue influence occurred. In other words, the setting aside of the will was a separate wrong and another pleaded form of relief. We overrule issue three.

By issue four, Rene complains that there is no evidence of fraud because there was neither evidence of an enforceable contract nor evidence of reliance on the alleged agreement. The jury was charged that fraud occurs when a party makes a material misrepresentation with either knowledge of its falsity or made recklessly, the misrepresentation is made with the intention that it should be acted upon by the other party; and the other party relies upon the misrepresentation and suffers injury. Both Noe and Joel testified that the agreement Noe made with Rene was that Rene would split the estate evenly in return for the brothers not contesting the will. The agreement was never reduced to writing and Rene denied that he ever made the agreement. In fact, Joel did not testify that Rene made that agreement with him. Apparently, the conversation regarding the agreement took place between Noe and Rene. Noe testified as follows:

14

> He—first he asked if we were going to contest the will. Before I answered he said, "Do not do that Noe, don't go that route. You know, I'm going to split everything evenly with you guys." That's what he said, that's what he told me.

In terms of a timetable, Carlos died March 18, 2006; the application to probate the will was filed on April 26, 2006; it was admitted to probate on April 17, 2007, and the brothers filed their will contest two months later, on June 27, 2007. According to the brothers, Rene told Noe he would split the estate if they did not contest the will. Rene did not split the funds with them, so the brothers filed the will contest.

Whether an agreement fails for indefiniteness is a question of law for the court. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992); *Knowles v. Wright*, 288 S.W.3d 136, 143 (Tex. App.–Houston [1st Dist.] 2009, pet. denied). "In order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook." *T.O. Stanley Boot Co., Inc.*, 847 S.W.2d at 221. Although Texas courts favor validating contracts, a court may not create a contract where none exists. *Id.* However, courts strive to hold contracts enforceable, even amid allegations of uncertainty. *In re C & H News Co.,* 133 S.W.3d 642, 647 (Tex. App.–Corpus Christi 2003, orig. proceeding).

The alleged contract at issue here was sufficiently definite to be enforceable. While there was no discussion among the brothers how the estate would be split, there was testimony that it was to be split equally, one-fourth of the estate to each brother. There was also evidence that the brothers did not immediately contest the will because they trusted that Rene would keep his promise to them. The jury believed that the agreement had been made and that Rene had no intention of keeping his promise. There is more than a scintilla

15

of evidence to support the finding. We overrule issue four.

By issue five, Rene argues that the brothers provided no evidence to support the award of consequential and emotional distress damages. Consequential damages are defined as "'those damages which result naturally, but not necessarily,' from the defendant's wrongful acts." *Baylor Univ. v. Sonnichsen,* 221 S.W.3d 632, 636 (Tex. 2007) (quoting *Henry S. Miller Co. v. Bynum,* 836 S.W.2d 160, 163 (Tex.1992) (Phillips, C.J., concurring)). Direct damages, on the other hand, compensate for the loss that is the necessary and usual result of the act. *Id.* (citing *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 816 (Tex.1997)). When special or consequential damages are sought, the plaintiff must demonstrate that those damages proximately resulted from the fraud alleged. *Libhart v. Copeland,* 949 S.W.2d 783, 800 (Tex. App.–Waco 1997, no writ).

Here, Rene urges that the brothers failed to provide any evidence to substantiate the jury's award of $40,000 to each brother in consequential damages. The amount was not argued by counsel in final argument, nor do we find any evidence to support that amount or any other amount of consequential damages in the record. The brothers do not argue or address the issue in their appellees' brief.

Rene also urges that the brothers provided no evidence of past "emotional distress" damages "reasonably expected to be caused by the fraud." The jury was not given a definition of the term "emotional distress," but it awarded $25,000 to each of the three brothers. We apply a traditional no-evidence standard to a mental anguish finding to determine whether the record reveals any evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment or anger. *Parkway*

16

*Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex. 1995); *J.B. Custom Design & Bldg. v. Clawson,* 794 S.W.2d 38, 43 (Tex. App.–Houston [1st Dist.] 1990, no writ). An award of mental anguish will survive a legal sufficiency standard when the plaintiffs have introduced direct evidence of the nature, severity and duration of their mental anguish. *Parkway Co. v. Woodruff*, 901 S.W.2d at 444. Mental anguish damages are generally not recoverable for breach of contract. *Latham v. Castillo,* 972 S.W.2d 66, 72 (Tex. 1998); *UMLIC VP LLC v. T&M Sales and Environmental Sys., Inc.*, 176 S.W.3d 595, 616 (Tex. App.–Corpus Christi 2005, pet. denied). They are recoverable, however, in a limited number of contractual scenarios that deal with intensely emotional noncommercial subjects, such as preparing a corpse for burial or delivering news of a family emergency*. City of Tyler v. Likes*, 962 S.W.2d 489, 496 (Tex. 1997). They are also available in fraud cases. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006).

This was a fraud case based on an alleged breach of contract. We do not decide here if this is the type of case where mental anguish damages are recoverable because the brothers presented no evidence of emotional distress or mental anguish with respect to the fraud claim. In final argument, the brothers' counsel urged: "The law—I didn't put it in, because I wanted to, but the law says if you're defrauded, you're entitled to emotional damages. I'm not going to put a value on what they had to go through with their dad feeling the way he did before his death." The brothers were not entitled to mental anguish damages with respect to the undue influence claim. The jury was charged that it could award damages for "emotional distress reasonably expected to be caused by the fraud." There was no evidence offered concerning mental anguish as it applied to the fraud claim.

17

The brothers do not provide us any insight in their brief regarding what evidence they believe constituted mental anguish as a result of the alleged fraud. We sustain issue five.

By issue six, Rene argues that there is no basis for the jury's award of exemplary damages. Rene makes no complaint regarding the amount of damages awarded. The jury found that Rene defrauded his brothers, and we have upheld that finding. Exemplary damages are properly awarded only if the claimant proves by clear and convincing evidence that the harm results from fraud. TEX. CIV. PRAC. & REM. CODE ANN. § 41.003 (Vernon Supp. 2009). The jury so found. The harm was Rene's failure to share the estate, as promised. We will not substitute our judgment for that of the jury who heard the testimony and weighed the credibility of the witnesses. We overrule issue 6.

## IV. CONCLUSION

We affirm the trial court's judgment with respect to the undue influence and fraud claims and affirm the trial court's award of actual and exemplary damages as a result of the fraud. We reverse the award of consequential damages and mental anguish damages and render that appellants take nothing on those elements of damages.

ROSE VELA
Justice

Delivered and filed the 24th
day of June, 2010.